UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**CV 12 - 2056**

**IRIZARRY, J.**

-------------------------------------------------------

SUSAN LEVY,

                  Plaintiff,

      Against.

JOSEPH WELSH, MOORE MACRO FUND, LP, MOORE
GLOBAL FIXED INCOME MASTER FUND, LP, MOORE
ADVISORS, LTD, MOORE CAPITAL ADVISORS, LLC,
MOORE CAPITAL MANAGEMENT, LP, MOORE CAPITAL
MANAGEMENT LLC, LOUIS BACON, EUGENE BURGER,
CHRISTOPHER PIA, THE NEW YORK MERCANTILE
EXCHANGE, INC. THE CME GROUP, INC., NYMEX
FLOOR BROKERS AND CLERKS JOHN DOES 1-20, MF
GLOBAL FLOOR BROKERS AND CLERKS, JOHN DOES,
21-40,

                  Defendants.

-------------------------------------------------------X

12- CV- _____

**VERIFIED COMPLAINT,**

**JURY TRIAL DEMANDED** GO M.J.

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
2012 APR 26  PM 2: 40
FILED
CLERK


Plaintiff, Susan Levy, Esq. representing herself, complains upon knowledge with
respect to allegations regarding herself and her losses in the NYMEX Platinum market and upon
information and belief as to all other matters and parties as follows.

## INTRODUCTION

1. This Complaint is based on pervasive manipulation of the Platinum Market
from approximately 2006 through 2008 whereby the prices of NYMEX Platinum as well as
Palladium as well as spot prices were skewed, distorted and rigged. As a result, investors such as
Plaintiff were damaged and lost their investments.

-1-

2. On April, 29, 2010, the Commodities Future Trading Commission issued a Consent Order, CFTC Docket No.10-09 (April 29, 2010) fining Moore Capital $25,000,000.00 (25 Million Dollars), the third largest fine in the history of the CFTC, upon information and belief, for attempted Market Manipulation of the Platinum and Palladium Markets in violation of the Commodities Exchange Act, 7 U.S.C. 9(b) and 13(b) from approximately November, 2007 through May, 2008.

3. The CFTC found that Moore Capital, through its Future Commission Merchant MF Global, intended to manipulate the NYMEX Platinum and Palladium Markets by entering "bang the close" transactions that intended to artificially and in an uneconomic fashion increase the settlement prices of NYMEX Platinum and its very related commodity, Palladium. See In Re Amaranth Natural Gas Commodities Litigation, 612 F. Supp. 2d 376 (S.D.N.Y. 2009).

4. The Moore Capital Defendants attempted to place orders for NYMEX Platinum in an uneconomic fashion, not comporting with supply and demand, but instead, in an artificial manner to purposefully increase the settlement prices of NYMEX Platinum and Palladium.

5. Christopher Pia, one of the Moore Portfolio managers, was also personally fined $1,000,000.00 (One Million Dollars) in connection with his attempted manipulation of the NYMEX Platinum and Palladium Markets.

6. As of March 14, 2008, Joseph Welsh, III. a former MF Global employee is or was subject to a CFTC action in the Southern District of New York for the same manipulative conduct of the Platinum and Palladium NYMEX contracts as complained of herein.

7. Although Moore Capital allegedly earned $54,000,000.00 in profits due to the

alleged attempted manipulation, they were only required to return $26,000,000 to the CFTC as a fine.

8. Although the CFTC did collect a fine of $26,000,000, the individual holders of NYMEX Platinum, such as Plaintiff herein, sustained severe losses *inter alia* as a result of this Market Manipulation, Fraud, Bad Faith Conduct, Violations of the Sherman Act and RICO Act and pendant state claims.

9. Plaintiff, as a NYMEX, Platinum holder, invested in NYMEX Platinum from approximately February, 2008 through September, 2008 losing her entire Platinum investment of $280,000.00 as well as other non-Platinum investments of $84,000.00 that were caused to be lost due to the sudden collapse of the Platinum market. Plaintiff also claims statutory treble damages as well as punitive damages, interest of 9% based on New York's Statutory rate, costs and disbursement as well as other damages including Attorneys fee for this outrageous conduct that shocks one's conscience.[6]

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, and §1337 in that this action arises under the laws of the United States, more particularly, the

---

[6] Although there is a Class Action currently pending in the Southern District of New York entitled In Re Platinum and Palladium, 10-CV-3617 (2010, Judge Pauley) of which Ms. Levy may be a class member, (although the arbitrary class action periods does not extend to Ms. Levy's losses in August of 2008), Ms. Levy prefers to proceed herself, and will at the appropriate time opt-out of the Class Action, if necessary. That Class Action was already dismissed once, and she fears another dismissal. She refuses to sit around and get dismissed based on the Class Action Attorneys' view of this case, which is quite distinct from her view of the case. Ms. Levy's case is also quite distinct from the class action in that the claims are different and the parties are different, although there is certainly overlap. Ms. Levy believes she can get a fair trial in the Eastern District of New York where she can proceed to trial by a jury of her peers.

Commodities Exchange Act ("CEA"), 7 U.S.C.§ 1, Et. Seq., the Sherman Act, The Clayton Act

15 U.S.C.§ 1, Et. Seq.  and the RICO Act 18 U.S.C.§ 1961, Et. Seq.  This Court may also

exercise pendent jurisdiction over the common law claims and State law claims asserted by

Plaintiff pursuant to this Court's supplemental jurisdiction pursuant to 28 U.S.C.§ 1367(a) and

the Federal Rules of Civil Procedure, 18(a).

     11.  Venue is proper in the Eastern District of New York pursuant to 28 USC

§ 1391, 7 U.S.C. § 25© and 18 U.S.C.§ 1964(c).

**PARTIES**

     12.  Plaintiff, Susan Levy resides in the State of New York.

     13.  Plaintiff Susan Levy purchased and sold NYMEX Platinum Futures through

her Future Commission Merchant ("FCM")[7], MF Global from approximately February, 2008

through September, 2008 and therefore has standing pursuant to 7 U.S.C. §25(a) to bring this

action for damages.

     14.  Plaintiff was caused to enter the market at artificially high prices that

suddenly dropped once the manipulation stopped.

     15.  Because of this precipitous price decline, due to defendants cessation of its

manipulative conduct, Platinum plummeted back to its appropriate market price based on supply

and demand, thus, Ms. Levy received a Margin Call on August 15, 2008 which resulted in the

termination of her Platinum investment and most of her non-platinum commodities portfolio as

well.  See Platinum Graphs annexed hereto as Exhibit 1.

     16.  Plaintiff certainly did not understand what happened and was extremely

---

[7]A Futures Commission Merchant is defined under the Commodities Exchange Act as

disturbed to find out by reading in the newspaper in 2010 that her investments had been manipulated.

17. By September of 2008, she was forced to liquidate all but two of her remaining futures contract positions which were non-platinum.

**Joseph Welsh**

18. Defendant Joseph Welsh resides in NorthPort, New York which is in Suffolk County.

19. During the relevant time frame as issue herein, from September, 2006 through December 31, 2008, Joseph Welsh was senior Vice President for Defendant MF Global, Inc.

20. Joseph Welsh headed up the "Welsh/Marceano" Group at MF Global. Mr. Welsh reported to Tom Harte, MF Global's CEO of U.S. Business, and ultimately to Kevin Davis, MF Global, CEO.

21. Defendant Welsh was registered as an Associated Person with the NFA from 2006 to 2008.

22. Defendant Welsh was not registered as a Floor Broker with the NFA from 2006 to 2008.

23. Defendant Welsh was the Associated person responsible for purchasing NYMEX Platinum and Palladium for the Moore Capital Accounts who were customers at MF Global, Inc. from 2006 to 2008.

24. Joseph Welsh placed orders for Platinum and Palladium over the NYMEX for the Moore accounts from 2006 through 2008.

25. MF Global, Inc. Employees John Does #21-40, although unnamed at this

point may have served as Floor personal on behalf of Joseph Welsh in executing Platinum

Futures trades from 2006 through 2008.

## MF Global ("MFG")[8]

26.  MF Global, Inc., ("MFG" hereinafter) from 2006 to 2008, was a financial

derivatives broker.

27.  MFG was also from 2006 to 2008 a registered Broker-Dealer under Section

15(b)(11) of the Securities Exchange Act.

28.  MF Global, Inc. From 2006 to 2008 was located at 717 Fifth Avenue, New

York, New York.

29.  MF Global was a registered FCM or Future Commissions Merchant with the

NFA, National Futures Association, the Self-Regulatory Organization for the Futures Industry.

30.  The Moore defendants maintained one or more Customer accounts with MF

Global from 2006 through 2008.

31.  MFG was the Moore defendants FCM with respect to placing its orders for

Platinum from June, 2006 through December, 2008.

32.  MF Global, Inc. was a clearing house member of the New York Mercantile

Exchange, from 2006 to 2008.

33.  As Such, MFG was authorized to accept and execute trades on the NYMEX

on behalf of its customers, including the Moore defendants.

_____

[8]MFG is not a named defendant in this Complaint and is not being sued because MFG is
presently a debtor in liquidation, and its parent MF Global Holdings, Inc. is also a debtor in a
Chapter 11 Bankruptcy Reorganization,  However, Ms. Levy is pleading facts with specificity
and in order preserve her right to add MFG back into the case at a later date if possible.

34. As such, MFG was authorized to accept and execute trades on the NYMEX on behalf of its customer, including Plaintiff herein.

**THE MOORE FUND Defendants**

35. Defendant Moore Macro Fund, LP ("MMF") was and is multi-billion dollar investment fund organized under the laws of the Bahamas and doing business in New York City at 1251 Avenue of the Americas.

36. Defendant Moore Global Fixed Income Master Fund, LP ("FIF") was and is a multi-billion dollar investment fund organized under the laws of the Bahamas and doing business in New York.

37. Defendant Moore Macro Fund, LP  purchased NYMEX platinum and palladium futures contracts and physical platinum and palladium from June, 2006 through the end of 2008.

38. MMF received statements for such NYMEX Platinum futures contract transactions that were addressed to Moore Macro Fund LP.

39. Defendant Moore Macro Fund, LP  received substantial profits from the purchase and sale of NYMEX Platinum and Palladium from June, 2006 through December 31, 2008.

40. Defendant Moore Global Fixed Income Master Fund, LP, also purchased and sold NYMEX platinum and palladium futures contracts and physical platinum and palladium from September, 2006 through December 31, 2008.

41. Defendant FIF received statements for such NYMEX platinum and palladium purchases and sales.

42. Defendant FIF received profits from the Platinum and Palladium trades and positions which were paid for by and for the benefit of the FIF.

43. Defendants MMF and FIF gained approximately $54,000,000.00 (54 Million Dollars) from their investments in NYMEX Platinum and Palladium from June, 2006 through December 31, 2008.

**THE MOORE CAPITAL DEFENDANTS**

44. Defendant Moore Capital Advisors, LLC ("MCA LLC") is a Delaware limited liability company with headquartered at 1251 Avenue of the Americas, New York, New York.

45. Moore Capital Advisors, LLC was and is a registered commodity pool operator ("CPO") and commodity trading advisor ("CTA").

46. During the relevant time frame at issue herein from June, 2006 through December 31, 2008, Moore Capital Advisors, LLC. served as a co-general partner of the Moore Macro Fund and the Moore Global Fund.

47. Defendant Moore Advisors, Ltd. ("MA Ltd") is a Bahamian international company and registered as a CPO.

48. Defendant Moore Advisors, Ltd. is a commodity pool operator registered with the CFTC.

49. Moore Advisors, Ltd. also served as the co-general partner of the Moore Macro Fund, LP and the Moore Global Fixed Income Fund, LP from June, 2006 through December 31, 2008.

50. Defendant Moore Capital Management, LP ("MCM") is a Delaware limited

-8-

partnership with headquarters at 1251 Avenue of the Americas, New York, New York.

51. Defendant Moore Capital Management, LP is a multi-strategy investment firm that manages several investment funds including MMF and FIF that invest in a wide variety of instruments, including but not limited to commodities and commodity futures contracts.

52. MCM is registered with the National Futures Association as a commodity trading advisor.

53. MCM is a principal of Moore Capital Advisors, LLC.

54. MCM is the successor in interest to Moore Capital Management, LLC.

55. Defendant Moore Capital Management LLC ("MCM LLC") was and is a Delaware limited liability company.

56. Moore Capital Management LLC was registered with the National Futures Association as a Commodity Trading Advisor during the relevant time frame at issue herein.

57. From June, 2006 through the end of December, 2008, MCM LLC employed Christopher Pia.

58. MCM LLC served as the discretionary investment manager of the Macro Fund (MMF).

59. The Moore Capital defendants made the investment decisions on behalf of the Moore Fund defendants from June, 2006 through December 31, 2008.

60. In consideration for such investment advice, the Moore Fund defendants contractually owed payments as compensation to the Moore Capital defendants including the Moore Advisors, LLP and the Moore Advisors, Ltd for their advisory and related serviced.

61. The Moore Capital defendants were entrusted to manage the capital and

invest the capital in the Moore Funds.

62.   Plaintiff refers to the Moore Fund defendants and the Moore Capital defendants collectively as the Moore Enterprise Defendants.

63.   Together the Moore Enterprise Defendants managed approximately $15,500,000.00 dollars from June, 2006 through December 31, 2008.

64.   The Moore Enterprise defendants had tremendous economic resources to purchase and sustain their margin requirements for NYMEX Platinum and Palladium futures contracts from June, 2006 through December 31, 2008.

## THE MOORE INDIVIDUAL DEFENDANTS

65.   Defendant Louis Bacon resides in the State of New York.

66.   Defendant Louis Bacon was the Chairman, Chief Executive Officer and director of Moore Capital Management, LLC.

67.   From 2006 through 2008, defendant Bacon was the Chairman and Chief Executive Officer of Defendant Moore Capital Management LP.

68.   Defendant Louis Bacon was and is the beneficial owner of defendant Moore Macro Fund, LP.

69.   Defendant Louis Bacon was and is indirect beneficial owner of shares held for Moore Macro Fund LP.

70.   Defendant Bacon was during the relevant time period the Chief Executive officer of defendant Moore Macro Fund, LP.

71.   As such, Defendant Louis Bacon was from June, 2006 through December 31, 2008, the beneficial owner of defendant Moore Macro Fund LP.

-10-

72. During the relevant time frame, defendant Bacon was the indirect beneficial owner of shares held for Moore Macro Fund LP.

73. Defendant Louis Bacon conducted business and still conducts business in New York at 1251 Avenue of the Americas in connection with the Moore Enterprise Defendants.

74. Defendant Bacon made decisions in connection with trading in NYMEX platinum during the relevant time frame that artificially increased the settlement prices of NYMEX platinum. See Chart annexed hereto as Plaintiff's Exhibit 2.

75. Defendant Bacon personally managed the Moore Funds as its Portfolio Manager during the relevant time frame at issue herein.

76. Defendant Louis Bacon had the ultimate decision making authority to execute platinum trades on behalf of the Moore defendants during the relevant time frame.

77. Defendant Louis Bacon had an obligation to supervise his employees including Christopher Pia and Eugene Burger.

78. Defendant Louis Bacon ordered the Platinum trades listed in the Schedule annexed hereto as Plaintiff's Exhibit 2.

79. Defendant Bacon during the relevant time period made decisions to purchase NYMEX platinum for higher prices than the prevailing market settlement prices for Platinum. See Chart annexed hereto as Plaintiff's Exhibit 3 and Exhibit 2 as well.

80. Defendant Bacon communicated with other Moore Capital Defendants about his decisions to trade in NYMEX platinum during the relevant time periods, including Christopher Pia and Eugene Berger.

81. Defendant Christopher Pia resides in Greenwich, Connecticut.

82.  During the relevant time frame, defendant Pia conducted business in New York City at 1251 Avenue of the Americas.

83.  Defendant Christopher Pia was an employee of Moore Capital Management LLC during the relevant time frame at issue herein from approximately June, 2006 through December 31, 2008.

84.  Defendant Christopher Pia was a portfolio manager for defendant Moore Capital Management, LLC.

85.  Defendant Pia acted as the employee and/or agent in trading on behalf of Moore Capital Funds during the relevant time period at issue herein from June, 2006 through December 31, 2008.

86.  Defendant Christopher Pia made the decisions to purchase NYMEX Futures Platinum and Palladium Contracts during the relevant time period on behalf of the Moore Fund defendants.

87.  Defendant Christopher Pia was a close adviser to Co-defendant Louis Bacon.

88. Defendant Pia ordered the Platinum trades listed in the Schedule annexed hereto as Exhibit 2.

89.  Defendant Pia communicated with others at the Moore Capital Defendants about his decisions to trade in NYMEX platinum and palladium during the relevant time periods, including Louis Bacon and Eugene Berger.

90.  Defendant Pia during the relevant time periods made decisions to purchase NYMEX platinum at prices that exceeded the prevailing market settlement prices for that day.See Charts annexed hereto as Plaintiff's Exhibits 2 and 3.

-12-

91.  Defendant Eugene Burger resides in the State of New York.

92.  Defendant Eugene Burger conducts business in New York City.

93.  Defendant Eugene Burger was and is a trader at Moore Capital Management, LP.

94.  From 2006 through 2009. Burger worked with and took instructions from Defendant Pia and Defendant Moore Capital in connection with making trades on the NYMEX Platinum market.

95.  Defendant Burger during the relevant time periods made decisions to trade NYMEX platinum in such a way so that resulted in higher purchase prices than the prevailing market settlement prices for the day.

**The NYMEX ENTERPRISE Defendants**

96.  Defendant the New York Mercantile Exchange, Inc. is a Delaware Corporation licensed to do business in the State of New York. ("NYMEX")

97.  Defendant NYMEX is a contract market and board of trade as defined under the Commodities Exchange Act 7 U.S.C.§ 7, Et. Seq.

98.  Defendant, NYMEX has its principal place of business at One North End Avenue, New York, New York.

99.  Defendant NYMEX charged plaintiff Exchange Fees every time plaintiff traded in NYMEX Platinum through her broker MF Global, Inc.

100.  Defendant NYMEX is the World's largest Platinum market and is the exclusive contract market that may buy and sell Platinum Futures Contracts in the United States.

-13-

101. Defendant NYMEX only trades with clearing house members.

102. NYMEX employed NYMEX Floor Brokers and Clerks, John Does, 1-20 whose job it was to properly execute trades on the Floor of the NYMEX according to the NYMEX Rulebook as well as the NFA Compliance Rules as well as the Commodities Exchange Act and Commission Rules.

103. The NYMEX is now a wholly owned subsidiary of the CME Group, Inc.

104. The NYMEX is a division of the CME Group, Inc.

105. The CME Group, Inc. is Delaware Corporation with its Principal place of business in Chicago, Illinois.

106. The CME Group, Inc. owns the NYMEX as well as other exchanges including the Chicago Mercantile Exchange ("COMEX") as well as the Chicago Board of Trade ("CBOT").

107. The CME Group, Inc. does business in New York.

108. The CME Group. Inc. has a board of directors who are charged with the obligation of overseeing NYMEX's operations.

109. The CME Group, Inc. has a governing board of directors who are charged with the duty of maintaining an orderly market for the members of the public as well as other market participants.

110. The members of the boards of directors sit on various committees and supervise the NYMEX.

111. One of the key functions of the CME group, Inc. board of directors is to review and publish settlement prices for NYMEX Platinum on a daily basis.

-14-

112. One of the members of the board of directors during the relevant time frame and currently was and is Joseph Nicifaro.

113. Joseph Nicifaro was from 2009 through 2011 Chief Executive Officer of Pia Capital, Inc. owned by defendant Christopher Pia.

114. Together with Mr. Pia from 2009 to 2011, Mr. Nicifaro raised $800 Million Dollars for the Pia Fund.

115. Mr. Nicifaro and Defendant Pia during the relevant time frame herein had a close relationship.

**The Individual NYMEX Floor Broker and Clerk Defendants John Does #1-20**

116. The NYMEX employs Floor Brokers who are allowed to execute trades on the Floor of the NYMEX as well as over the Globex.[9]

117. The Commodities Exchange Act, 7 U.S.C. § 1(a)(16), has a specific definition of Floor Broker which applies to the NYMEX Floor Brokers.

> "The term 'floor broker' means any person who, in or surrounding any pit, ring, post, or other place provided by a contract market or derivatives transaction execution facility for the meeting of persons similarly engaged, shall purchase or sell for any other person any commodity for future delivery on or subject to the rules of any contract market or derivatives transaction execution facility."[10]

---

[9] The Globex is the electronic platform that allows investors to place trades over the Internet on what is called the Electronic Platform. On the other hand, the Floor or the Pit is where orders consisting of bids and asks are verbally communicated over the Exchange in an open outcry fashion. The two exchanges were available in 2008 for NYMEX Platinum and were or should have been completely interchangeable and transparent, since each floor broker must use both systems interchangeably to get the best fill for the customer.

[10] The NYMEX Rulebook also defines Floor Broker as: "An Individual who executes orders on the floor of the exchange for any other person and who is registered as a Floor Broker under the CEA [Commodities Exchange Act].

118. A Floor Clerk assists a Floor Broker.

119. Because the NYMEX Floor Brokers are the ones who actually make the market and purchase or sell a particular futures contract, they possess enormous market power to determine prices in the futures market.

120. Under the NYMEX Rules, the Floor Brokers **must** get the best available price for the customer.

121. According to the NYMEX Rulebook a "Market Order;" is defined as "an order with instructions to be executed upon receipt of a floor broker at the best available price."

122. Indeed, under NYMEX Rule 514.A(1)., it is considered a violation for any trading floor employees to enter "a bid or ask out of line with the market."

123. It is equally a violation under NYMEX Rule 514(A)(2) to enter "a trade through the existing bid or offer."

124. NYMEX Rule 532 also prohibits NYMEX Floor Brokers from disclosing other orders in a particular market.

125. NYMEX Floor Brokers are supposed to keep all orders confidential and not disclose to other market participants the outstanding orders under NYMEX Rule 532.

## FACTUAL BACKGROUND

### The NYMEX Futures Contract Market

126. A Commodities Futures Contract is a bilateral, standardized, executory contract for the purchase and/or sale of a particular commodity.

127. The Futures contract allows a market participant to either buy or sell the particular underlying commodity within a specific time period.

-16-

128. The contracts are standardized in that they are defined by the exchange upon which they are traded.

129. The price of the underlying commodity fluctuates until the contract expires, therefore speculators either gain or lose based on the value of the contract at expiration.

130. Commodities Futures Contracts also differ from securities, because one does not buy shares rather one must post "initial margin" defined by the exchange.

131. Unlike shares, future contracts require the market participant to then post maintenance margin to avoid a liquidation.

132. If the investment increases in value, that increase will be reflexed as excess equity allowing the participant to purchase more contracts without even putting down more cash in some cases.

133. Whether a futures contract gains or loses in value is determined on a daily basis by what is know as "mark to marketing" a position.

134. "Mark to market" means that on a daily basis the value of the contract is determined by the exchange on which it is traded.

135. The mark to market value of the contract is determined by the daily "Settlement Prices" that are determined by the Contract Market in this case the NYMEX.

136. Futures contracts are highly leveraged instruments.

137. Many Future contract participants invest in futures in the hope of monetary profits, and many investors have no intention of ever taking or tendering physical delivery of the actual commodities.

138. Futures contracts also expire and all positions must be closed out before

-17-

"the first notice day for delivery." If the owner of the contract does not close out her position timely, and she is long, she must take physical delivery of the commodity and pay for it based on the current price at the time the contract expires.

139. The buyers of a futures contract are one-half of the bilateral futures contract and the one half of the commodity futures market. They are referred to as "longs."

140. The sellers are the other one-half of the bilateral futures contract and one-half of the commodity futures market. They are referred to as the "shorts"

141. In addition to the daily settlement prices, each day, the NYMEX publishes what is called "open interests" which show how many longs and shorts exist at the end of each day. Open interest show the number of contracts that exist in the particular market on a daily basis. See Plaintiff's Exhibit 4 showing Open Interests for the April, 2008 NYMEX Platinum Contract.

142. Open interest is defined as the total number of futures contracts in a delivery month or market that has been entered into and not yet offset.

**The NYMEX Platinum Contract**

143. NYMEX defines a Platinum Contract as a contract to purchase or sell 50 troy ounces of 99.95% pure Platinum which consists of ingot or plates weighting at least ten ounces.

144. Platinum is both a precious metal and an industrial metal that is traded throughout the world both in the Physical ("Spot") and Futures market.

145. In the United States, Platinum is traded as a futures contract exclusively in New York over the New York Mercantile Exchange.

-18-

146. Platinum is part of the "Platinum Group Metals" that also includes a very similar metal called Palladium.

157. Platinum and Palladium are extremely related because both are used to make Catalytic converters to control pollution emissions in automobiles.

158. However, these two metals do differ because Platinum is also a precious metal, like Gold, used to make fine jewelry; whereas Palladium, unlike Platinum and Gold, is not considered a precious metal.

159. Platinum and Palladium are sold in both the physical or spot market and futures market. As such, they are considered commodities.

160. In 2008, NYMEX Platinum futures contracts could be traded either on the Floor of the NYMEX or over the Globex Electronic Platform.

161. The Globex is and was an Electronic Platform whereby orders to buy and sell NYMEX Platinum could be made over the MF Global Platform called the XPRESS Platform.

162. On the other hand, the open outcry system, unlike the Globex, involved physical trading in a pit in at the New York Mercantile Exchange.

163. Both NYMEX and their Clearing House Members such as MF Global had Floor brokers in the NYMEX pit that traded futures contracts on behalf of their clients.

164. The floor brokers would actually buy or sell Futures Contracts directly on the Floor of the NYMEX exchange whereby Floor Brokers using order tickets verbally communicated bids and asks in a trading pit.

165. Floor Brokers trading in the pit were required to keep order tickets and

-19-

trading cards to reflect the transactions that occurred.

166.  These order tickets and trading cards stated the prices at which the contracts sold as well as the bid and ask, the date and time the transaction occurred and the name of the brokers who filled the orders.

167.  Both the Globex and the Open Outcry system existed simultaneously at the NYMEX during 2008.

168.  In 2008, the Globex was practically a 24 hour a day system; whereas the NYMEX open outcry system on the Floor of the Exchange opened at 8:20 a.m. and closed on a daily basis at 1:05 pm Eastern Time. If one wanted to trade Platinum contracts after 1:05 pm., he or she would have to use the Globex or wait until the next morning when the NYMEX Open outcry system resumed, again until 1:05 pm.

169.  Both systems, the Globex and the Open Outcry system worked together and were supposed to be treated as one unified system.

170.  Under the Best Execution Rule, both systems required the floor brokers to get the best fill for the customer, notwithstanding where the customer placed the order.

171.  So, for example, if a customer placed a buy market order on the Globex, it could be filled on the Floor, if the prices were lower on the Floor and vice versa.

**Historical Prices of Platinum**

172.  The prices of platinum soared from their traditional levels of $300 to $600 dollars per troy ounce to $1600 and up to $2200 per troy ounce up until approximately the second half of 2008.  See Plaintiff's Exhibit 1.

172.  From approximately, August, 2008 through December, 2008, after the

manipulation was winding down, NYMEX platinum prices reversed and plunged to approximately $900 per troy ounce.   See Plaintiff's Exhibit 1

173. Historically, from approximately 1992 through 1998, platinum traded below $400 per troy ounce.

174. From approximately 1999 through 2006, the price of Platinum precipitously increased to approximately $1200 per ounce.

175. After the manipulation ended, for the time being, due to the CFTC investigation, and by the end of December, 2008, Platinum was trading in the range of $900 per troy ounce. See Plaintiff's Exhibit 1.

176. However, from approximately June of 2006 through at least June, 2008, the price of NYMEX Platinum futures contract soared to approximately $2200 per troy ounce.

177. These prices from June, 2006 through August, 2008 did not reflect supply and demand for Platinum.

178. The NYMEX Platinum futures contract market is an extremely illiquid contract.

179. Open Interests only exist for 4 months in NYMEX Platinum, January, April, July and October.

180. In fact, regarding the April, 2008 NYMEX Platinum contract there were less than 10 open interests on the NYMEX from August 14, 2007 through September 24, 2007.

181. During the months of September and October, 2007, open interests in NYMEX Platinum increased to less that 200 contracts.

182. From November 7, 2007 to May 8, 2008, the dates that the CFTC found

attempted Manipulation, the open interests increased at one point up to approximately 19,000

Platinum Contracts in January, 2008 due to the fact that so many investors came into the market

based on the phony settlement prices tricking investors into seeing false buy signals. See

Plaintiff's Exhibit 4.

**Daily Settlement Prices for NYMEX Platinum**

183.  The settlement price of a Platinum contract is the volume weighted average

of the shares traded during the last 120 seconds of trading on the Open Outcry system.

184.  The settlement prices of a particular commodity represent a determination of

a particular daily price of a commodity.   The settlement price of a commodity is extremely

important to the value of the commodity.  The other important prices on the day, are the opening

price, the high and the low on the day.

185.  The closing price is not necessarily the settlement price.  For example, in the

Platinum market, the settlement price of NYMEX Platinum is determined using a volume-

weighted average price of all transactions conducted over the NYMEX during the last 2 minutes

of trading.  So in other words, the settlement price of NYMEX platinum is based on all the

Platinum contracts traded during the last 120 seconds of trading on the NYMEX.

186.  The settlement prices are crucial for the market to evaluate the true price of a

commodity and the Plaintiff relied heavily on the settlement prices to determine to enter the

market.

187.  Settlement prices are also used to mark to market positions to see if one

needs to post more margin or if one has excess equity.

188.  The settlement prices are also used to plot points on charts that was also

-22-

highly relied by Plaintiff in deciding whether to enter the market place.

189. If the settlement prices are manipulated they become skewed and improper as in this case, and the entire market becomes a sham as it did.

190. Investors, such as plaintiff herein, relied almost exclusively on settlement prices to determine whether to enter the market place.

191. Because Plaintiff saw such strong rising prices, she read that to mean it was a good time to enter the market because under technical analysis, every time a new high is taken out, another new high is right around the corner.

192. Because many investors read the false rising settlement prices in the same manner, many investors entered the market again pushing prices up further and further.

193. Such technical analysis was based exclusively on these skewed and manipulated settlement prices.

194. Defendants treated the NYMEX platinum market as their private piggy bank and private boys club for members only to extort money from the investing public such as Plaintiff under the false pretenses that the value of platinum was validly rising based on supply and demand when in reality, the prices were artificial and uneconomic due to defendants' heinous manipulative conduct.

195. Eventually, by the summer of 2008, the Moore defendants would sell their inflated shares at a tidy profit to themselves while allowing the entire market to collapse back to its proper levels based on supply and demand, and absent this extraordinary manipulative conduct.

**Alleged Unlawful Conduct Regarding Manipulation of the NYMEX Platinum Contract**

**From At Least June, 2006 through at least June 2008**

196.   Provided that there is no price manipulation, the prices produced by futures contract trading serve three legitimizing functions: (1) price discovery, (2) efficient and fair risk transfer (also known as hedging), and (3) reduction in price volatility.  Cargill, Inc. V. Hardin, 452 F.2d 1154, 1173 (8th Cir. 1971.)

197.   Price Manipulation destroys all three legitimizing functions of commodity futures trading.  Id. Indeed, specific price manipulations in the past have even destroyed or greatly impaired various commodity exchanges and specific commodity futures contracts.

198.   Defendants began to conspire to fix the prices for NYMEX Platinum as early as June 7, 2006.  Their scheme involved: (1) purchasing large orders of NYMEX Platinum in addition to (2) buying Platinum on the close.  In both cases, these purchases were meant to and did in fact artificially inflate the prices of NYMEX Platinum.

**Banging the Close Transactions**

199.   Practically every day, from November 19, 2007 through May 21, 2008, an 127 day trading period, defendants engaged in 112 "bang the close transactions." See Plaintiff's Exhibit 3.

200.   To accomplish these bang the close transactions, defendants would wait until the end of the trading day or during the last 120 seconds of trading over the Open Outcry system (the "Pit") to place large orders of Platinum to increase the settlement prices. See Exhibits 2, 3 annexed hereto.

201.   Normally, prices are determined based on supply and demand of a particular commodity; however, when a market is manipulated, the normal factors that determine the price

-24-

of a commodity are skewed and the market price of the manipulated commodity is uneconomic and artificial.

202. In this particular case, defendants in artificially manipulating the price of NYMEX platinum caused the prices of platinum futures to increase in value by unlawful conduct referred to colloquially as "banging the close"

203. "Banging the close" is slang used by some traders to signify the artificial increase in closing prices or settlement prices of a particular commodity.[11]

204. In this particular case of NYMEX platinum, defendants manipulated the market for NYMEX Platinum Futures Contracts *inter alia,* by intending to and actually waiting until the last 120 seconds of trading on the open outcry system, then placing large block orders for Platinum during this short window, knowing that these orders would artificially increase the settlement prices of NYMEX Platinum Futures Contracts. See Exhibits, 2, 3.

205. To do this, defendants used MOC or Market on Close Orders which meant that the order to purchase a long Platinum futures contract would be bid at the prevailing market price during the last 120 seconds of trading.

206. However, these were not MOC orders, because the NYMEX Floor brokers who set the Market asks were able to set these asks above the prevailing market prices that existed at the same time on the Globex.

---

[11] See In Re Amaranth, 612 F. Supp.2d 376 (S.D.N.Y. 2009) (Here the manipulation occurred in a similar fashion called "slamming the close" which was the reverse in that settlement prices were artificially decreased on the close"); see also, In Re DiPlacido, 2008 WL 4831204 (CFTC No. 01-23, Nov. 5, 2008); In the Matter of Avista Energy, Inc., 2001 WL 951736 (CFTC No. 01-21, Aug. 21, 2001); Strobl v. NYMEX, 768 F.2d 22 (2d Cir. 1985); Minpeco v. Nelson Bunker Hunt, Et. Al., 718 F. Supp. 168 (S.D.N.Y. 1989); National Super Spuds, Inc. V. NYMEX,. Et. Al., 77 F.R.D. 361 (S.D.N.Y. 1977).

207.   Therefore, there was a violation of offers and a violation of the best execution rule by disguising this unlawful conduct as MOC orders.

208.   These were also sham MOC orders because there was no Floor Broker from MF Global on the floor of the NYMEX Exchange to make sure that the bids went in at the prevailing market prices during the last 120 seconds of trading.

209.   Defendant Welsh, was the one to place the MOC orders directly with the NYMEX floor brokers.

210.   Defendant Welsh was not even registered as a Floor Broker as required by the NFA Compliance Rules and was not allowed to place orders on the Floor of the NYMEX exchange directly with NYMEX Floor Brokers.

211.   Only clearing house members through registered Floor Brokers can transact business in the Pit of an Exchange.

212.   The NYMEX Floor Brokers were supposed to reject Mr. Welsh's orders, since he was only registered as an associate and was not present on the Floor of the Exchange.

213.   As a result of having Welsh phone in the orders directly to the NYMEX floor brokers, the NYMEX floor brokers had unbridled discretion to set the asks at whatever they wanted and certainly higher than prevailing asks on the Globex.

214.   These MOC orders were therefore nothing more than violations of offers and evidence of manipulation.

215.   The use of MOC orders to initiate long positions in a rising market is also evidence of manipulation, because limit orders are normally used to get the best execution for the

purchaser in a rising market.[12]

216.   These Platinum positions were initiated for the accounts of the Moore Funds based on the Moore Capital and individual defendants decisions' to purchase NYMEX platinum in the manner described above.

**Large Positions held by the Moore Defendants**

217.   Another means of achieving artificial prices n the Platinum market during the relevant time frame was the purchase of large amounts of Platinum contracts either during the closing period or outside the closing period.

218.   Because large orders that are not broken down can artificially increase the price of a commodity, especially in an illiquid market, such as Platinum; this maneuver during the relevant time period also constitutes manipulation.

219.   To avoid this type of manipulation, the NYMEX had anti-manipulation rules regarding position reporting levels.  From 2006 through 2008 the reporting level required by the NYMEX defendants for Platinum was 25 contracts.

220.   The Moore Fund Defendants had from November 19, 2007 through at least May 29, 2008, exceeded 25 contracts on each an every day except 6 days and was required to report their holdings in excess of 25 contracts to the NYMEX.

---

[12] For example, if contracts for widgets are selling between $5 and $10 dollars per contract, in a rising market; a normal investor would enter the market with a limit order to purchase a widget contract for $5.  Because of the extreme market volatility in all commodities markets, the $5 will get filled eventually.  The limit order means that you only buy at $5.  A market order on the other hand, which can be used to liquidate a short position that is about to expire, for example, means that you can purchase the contract at any prevailing market price.  In this case, the Floor Brokers helped determine how to buy the Widget for more than the $10 price causing the settlement prices to go up to $11.  These increased settlement prices looked like demand was strong when it really was not at all.

221.  Defendants also possessed Palladium contracts in excess of 25 contracts on every single day except two in violation of position reporting levels.

222.  NYMEX also requires position accountability levels to be reported as well which for NYMEX Platinum was 1500 contracts per month.

223.  The Moore Fund defendants owned 1500 or more Platinum contracts per month on six trading days from November 19, 2007 through May 21, 2008.

224.  The Moore Funds also purchased  Platinum ETFs that held physical Platinum which also squeezed the prices for Platinum further during the relevant time frame.

**The NYMEX Enterprise Defendants Violated 17 CFR 1.51.**

225.  The NYMEX Enterprise defendants were supposed to have a Settlement Price Committee in place to review the prices that made up the daily settlement prices to ensure that these settlement prices were legitimate and not the result of market manipulation.

226.  The NYMEX Enterprise defendants were supposed to monitor all platinum trading to detect manipulation pursuant to 17 C.F.R. 1.51, and it was supposed to consider whether any market participant violated position limits and position accountability levels.

227.  For example, if one market participant owns too much of a commodity, the Settlement Price Committee may decide that the price is artificial and shut down trading.

228.  The NYMEX defendants calculated the settlement prices of Platinum contracts on a daily basis during this time frame, based on the transactions shown in Plaintiff's Exhibits 2 and 3.

229.  The NYMEX defendants published these Platinum Settlement prices on their websites on a daily basis.

-28-

230. At no time during the relevant time frame, did the NYMEX governing board of directors shut down trading in Platinum or take any emergency action in violation of 17 CFR 1.41.

231. At no time during the relevant time frame, did the NYMEX governing board take any action in connection with the large orders being placed by the Moore defendants and Joseph Welsh with respect to Platinum futures contracts.

232. Plaintiff relied on these daily settlement prices published on the NYMEX and CME website to make her decisions to invest in Platinum Futures.

## DEFENDANTS HAD THE ABILITY TO INFLUENCE PLATINUM FUTURES' PRICES

233. The Moore Defendants had $15,500,000.00 (15 Billion, 500 Million dollars) to invest and therefore had the economic power to influence Platinum contract market prices.

234. The Moore defendants used this capital to purchase NYMEX Platinum future contracts in large quantities between June, 2006 and June, 2008.

235. Because each contract for Platinum required an initial margin of somewhere between $5000 and $7500 per contract, when the Moore defendants purchased 100 contracts, for example, they had to post between $500,000.00 and $750,000.00 dollars in cash.

236. Certainly, their enormous market power is seen in this manner, whereas an individual investor such as Plaintiff could not compete for a market share.

237. Or, if the Moore defendants had excess equity in their accounts, they did not have to post cash at all as margin, but could use such excess equity to post initial margin for NYMEX Platinum.

238. Because excess equity occurs as settlement prices rise, defendant Moore

-29-

could have kept buying additional contracts out of their rigged maneuvers to boost settlement prices which would give them excess equity in their account.

239. The NYMEX defendants also had the ability to influence Platinum futures contract prices, since the NYMEX was the exclusive seller and buyer of Platinum Futures contracts in the United States.

240. The NYMEX floor broker defendants, actually had the authority to set bids and offers at whatever they wanted, although they were supposed to obey the best execution rule.

241. Therefore the NYMEX floor brokers defendants had the power to influence the market prices of NYMEX Platinum during the relevant time period.

242. The NYMEX defendants in calculating the daily settlement prices of Platinum had the ability to influence market prices of Platinum, since the settlement prices were used to "mark to market" each platinum position on a daily basis.

243. The NYMEX defendants also had the ability to influence NYMEX Platinum prices by publishing these daily settlement prices to the public who would use these prices to do technical analysis to decide whether it was a good time to enter the market for Platinum.

244. The NYMEX defendants did not have to use the VWAP of Platinum, if these prices looked improper and could have shut down trading instead to prevent misconduct.

245. Joseph Welsh had the ability to influence the prices of NYMEX Platinum contracts.

246. From June, 2006 through June, 2008, MF Global, Inc. was one of, if not the largest, derivative futures commission merchants who traded NYMEX Platinum.

247. From June, 2006 through June, 2008, MF Global, Inc. was a clearing house

-30-

member of the NYMEX and therefore was allowed to trade Platinum Contracts on behalf of their customers such as Plaintiff and the Moore Defendants.

248. According to each customer agreement that MF Global, Inc. entered into with each of its customers, MF Global, Inc. had the sole discretion to liquidate a customer's account in any case where unlawful conduct was occurring.

249. According to the MF Global Customer Agreement, MFG could also refuse to place orders on behalf of its customers at its sole discretion.

250. MF Global and Defendant Welsh therefore had the power to control the positions of its clients on the NYMEX exchange and could enter into transactions or terminate transactions on behalf of its customers at its discretion.

251. As a Vice President at MF Global, Inc. Joseph Welsh was able and did direct trading in the NYMEX Platinum Market by giving orders to purchase Platinum to the NYMEX Floor Brokers who followed his instructions.

252. Joseph Welsh by virtue of his position as the associated person for the Moore Defendants was charged with the authority to place large trades on the NYMEX Platinum Market for contracts ranging between 5 and 100 contracts at a time.

253. Because Welsh worked for MF Global, a clearing house member, Joseph Welsh could freely trade in large quantities on the floor of the NYMEX exchange thus having the ability to influence the market for NYMEX Platinum.

254. Louis Bacon as one of the portfolio managers of the Moore funds had the authority to and did commit the Fund's capital to purchase NYMEX Platinum from 2006 through 2008.

255. Defendant Bacon had the ability to influence Market Prices of Platinum during the relevant time frame.

256. Christopher Pia, as one of the portfolio managers of the Moore Funds had the authority to commit the Fund's Capital to purchase NYMEX Platinum from 2006 through 2008.

257. Defendant Pia had the ability to influence Market Prices of Platinum during the relevant time frame.

258. Eugene Berger assisted Pia and Bacon and therefore also had the power to effect the market prices of NYMEX Platinum.

## INTENTIONAL CONDUCT TO ARTIFICIALLY INCREASE PLATINUM PRICES

259. Defendants specific and general intent to manipulate the prices of NYMEX platinum by "banging the close" and by purchasing large amounts of Platinum in excess of 5 contracts at a time is obvious from the numerous phone conversations that were recorded and text messages that were discovered among defendants.

260. Defendants also had the dominant ulterior motive of self-interest and financial gain as a result of manipulating the prices of NYMEX Platinum.

261. Not only did defendants earn fees and/or commissions, they were also permitted to trade in their own proprietary and personal accounts.

262. Defendants had an express intent to overpay for NYMEX Platinum Contracts to increase the settlement prices of Platinum on a continuous basis from approximately June, 2006 through the June, 2008.

263. Defendants, Pia, Welsh, Berger and the NYMEX Floor Brokers manifest

their intent to manipulate NYMEX Platinum by increasing the settlement prices based on their usage of phrases such as: **"bid it up," "jack it,""a new high,""do whatever I can to get it [the price] higher,""see if you can get to the higherprice," "make sure it close[s] up," "start to march it up," "don't bid, just f–king pay up," "try and get above," "try and get 'em moving,'" "getting it up on the day," "move this thing,""as long as it stays up there," "make sure they don't come in"** lower, **"banging us out here," "tell them [floor traders] f–king [a higher price] or nothing, " "bid the b-itch up," "move it," "kill em," "buy 'em up,'"** and **"get [prices] up," "100 gets you an all-time high,"** squeeze [the shorts] make it ugly."

264.   Defendant Pia used the email address "donnydon66, " and the email address Cpia@bloomberg.net

265.   Defendant Welsh purchased Platinum contracts for the Moore Funds controlled by Pia and Bacon.

266.   Defendant Welsh was not just a mere order taker, he had the authority at any time to reject Pia's orders or to shut down Pia's account and/or to sell all of the contracts in Pia's account without Pia's consent where violative conduct existed according to the customer agreement.

267.   Beginning on June 8, 2006, an instant message between Christopher Pia of Moore Capital and Joseph Welsh of MF Global states regarding Platinum and Palladium trades (MFG 015555):

12:52:48: Pia          "and everything you do on close should be hard"

12:55:14: Welsh:     "Yes"

-33-

268.  On June 14, 2006, the Moore defendants, per defendant Pia, and MF Global per Welsh, had the following discussion regarding both Palladium and Platinum:

| 12:50:01 | Pia | "buy 50 Pall moc [market on close]. **U need to jack it [the price] up.** |
| 12:50:09 | Welsh | K [okay] |
| 12:51:10 | Pia | then sell 100 plat. But get me right after pal close as I want to put a limit on plat. But really do a lsoopy jb [buy at a high price] on pall |
| 12:51: 18 | Welsh | K [okay] |
| 1:00:05 | Pia | pall closed. |

269.  Defendants simultaneous purchasing of Palladium in the same manner as Platinum during the relevant time frame is further evidence of Manipulation because Platinum and Palladium were expected to move in tandem and thus the manipulation had to exist in both markets, as it did.

270.  On June 20, 2006, the Moore defendants, per defendant Pia, stated to MF Global per Welsh (MFG 015579): **"I only like to jack things [inflate prices] on close."**

271.  On June 27, 2006, the Moore defendants, per defendant Pia (at a time when, again, they were apparently selling platinum) actively discussed with MF Global, per Welsh, executing trades in palladium and platinum in a way to conceal the nature and true "move prices" purpose of their market-on-close trades (MFG 015590):

| 12:37:44 | Welsh | 313.5/316 |
| 12:38:24 | Pia | 31300 bid for 10 show it |
| 12:38:44 | Welsh | K |

-34-

| 12:49:39 | Welsh | Pall close in 10 mins |
|---|---|---|
| 12:55:56 | Pia | on the close I want u to bid up pall 10 lots. .and sell out that 25 plat.. **make it look like u have an error on the 25 u bot.** |
| 12:56:06 | Welsh | k |
| 1:05:27 | Welsh | bot 10 PAU6 at 314.52 |
| 1:05:34 | Welsh | sld 25 PLN6 at 1183 |

272.   Shortly after telling MF Global, per Welsh on June 20, 2006 that he liked to "jack things on close," the Moore defendants, per Pia, instructed Welsh to "**bid the bitch up**" on the close (MFG 015592 June 29, 2006.)

273.   To "bid" is to buy. To bid up is to pay higher prices.

274.   Defendant Pia is asking MF Global's Welsh to stay on the line with the floor broker to make to make higher prices in the purchase.

275.   On August 1, 2006, instant messages between Pia and Welsh discuss effort to try to overpay to move palladium through the market's "trend line" by purchasing "on the close" (MFG 015609).

276.   On September 7, 2006, the Moore Defendants, per Pia, told MF Global, per Welsh, to "buy 10 Paz6 right here," just minutes before the market closes.  Welsh asks if he should still buy "50 on close."  Pia tells Welsh "yes, or 40 dunt matter. **Which ever is biggest effect** [to inflate prices]."

277.   In the above-paragraph, defendant Pia is saying the amount of the purchase is **not** as important as the inflation of the prices; purchase **'which ever"** amount will inflate prices most.

-35-

278.  The next day, on September 8, 2006, the Moore Defendants, per Pia, just thirty seconds before the close, tell MF Global, per Welsh, to "stay on the bid" and to "**jam** 5 lots on close." Just one week later, on September 15, 2006, Defendants Pia and Welsh discussed executing last-minute trades to get the market price "moving." (MFG 015427.)

279.  On September 15, 2006, the Moore Defendants, per Defendant Pia, and MF Global, per Welsh, discussed their ability to move the markets and their intent to "get it [the prices] moving "just seconds before the market closed (MFG 015427.)

280.  On October 6, 2006, Defendants openly discussed how their trades inflated the market (MFG 015441).

281.  Defendants continued to enter into so called "market on close" trades in November and December of 2006, with the Moore Capital Defendants, per Pia, and MF Global, per Welsh, repeatedly discussing buying large lots "hard" on the close.

282.  On March 18, 2007, the Moore Defendants per Pia communicated to MF Global, per Welsh, to buy 100 of platinum and palladium, and to "**close hard.**" Just several days later, the Moore Defendants, per Defendant Pia, instruct MF Global per Welsh, to buy 100 lots of platinum and palladium on the close "**as hard as you can.**"

283.  On May 17, 2007, the Moore Defendants, per Defendant Pia, and MF Global, per Welsh, discuss as follows (MFG 001394):

| | |
|---|---|
| Pia: | "Buy 50 n plat here |
| Welsh: | K |
| Pia: | buy another 50 |
| Welsh: | K |

-36-

| Welsh: | bot the 25 lot at 355.70 |
|---|---|
| Pia: | u should be able to get it to settle under 3 lower |
| Welsh: | bot the 50 moc at 360 |
| Welsh: | I will pass the Pall to Eugene |
| Pia | ok where are we going to settle |
| Welsh: | they don't know yet |
| Welsh: | **we traded some volume on the high of the closing range which will help push it up** |
| Pia: | **I need it to settle higher. So get ready to argue. That is why.** I was buying cash, and futurs in the last 15 minutes |
| Welsh: | 358.20 |

284. In the above conversation "Eugene" refers to Defendant Berger, a trading assistant at Moore Capital. Thus, the "hard" market" close purchase, executed by MF Global, was "passed" from MF Global to Moore Capital representative Eugene Berger. And MF Global's Welsh himself says that MF Global did "help push it up"— pushed up the closing price–with their volume of MOC trades. Pia responds he wants MF Globals' Welsh to "argue" the price higher, because Pia "needs" the price to settle at a specific inflated price.

285. Defendants Pia and Welsh's manipulative intent to push Platinum prices higher is demonstrated by the a conversation on July 16, 2006 where it was decided that Welsh would stay on the phone line with the NYMEX Floor Brokers to achieve higher than normal closing prices:

286. The conversation of July 16, 2006 went as follows:

| Welsh: | "Close coming up in a few minutes |
|---|---|

-37-

| Pia | U haev [have] to buy on the close hard..please take these guys out |
|---|---|
| Welsh: | K |
| Pia: | Seriusly [Seriously] **keep yourself on the line.** Try to make it look llick [like] I am covering a short |
| Welsh: | K" |

MFG015595-597 [**Emphasis Supplied**]

287.  Further conversations indicate that NYMEX Floor Brokers also intended to manipulate the closing prices of NYMEX Platinum based on recorded conversations already discovered.

288.  On November 7, 2007, Pia asks Welsh to "buy 25 here and 25 **moc hard [inflate prices].**

289.  On November 7, 2007, Welsh responds to the above-request saying "ok."

290.  On November 13, 2007, Welsh and a  NYMEX floor clerk conspire to bang the close.

291.  On November 13, 2007, Welsh and a NYMEX floor clerk have the following conversation:

| Floor Clerk: | "we got about 45 seconds before the close...one minute guy... got 10 seconds. |
|---|---|
| Welsh: | buy 50 |
| Floor Clerk | buy half a hundred, market, but 'em up |
| Welsh: | **market don't bid just buy just f—king pay up[increase prices]** |
| Floor Clerk: | Just pay up [increase prices, buy em buy em." |

MFG015419_MFG MCM 00947_welsh-Wav_F58

292.  On December 10, 2007, between 1:00 and 1:02 pm., Welsh enters another order on the close telling the NYMEX Floor clerk to purchase 50 NYMEX platinum futures contracts.

293.  The NYMEX floor clerk agrees with Welsh to do whatever he can to increase the price:

| | |
|---|---|
| Floor Clerk: | "30 seconds, 20 seconds |
| Welsh: | Offered at 7 and a half |
| Floor Clerk: | **Best I can get but will do whatever I can to get it [the price] higher, 10 seconds** |
| Welsh: | buy 50" |

MFG01272_MFGMCM01726-welsh-nycomms Wav_2141.

294.  Because buyers of long positions normally want to buy as cheaply as possible, the reverse action occurring herein, of buying for a higher than normal price clearly shows defendants' manipulative intent.

295.  These conversations occurred continuously throughout 2006, 2007, and 2008.

296.  On or about January 4, 2008, the NYMEX floor clerk demonstrates that he wants to help manipulate the market for NYMEX Platinum: An excerpt reveals:

| | |
|---|---|
| Floor Clerk: | **"Okay, here we are on the close. On the March. . . . .** |
| | **Today, a good 100 lots [contracts]would really help, get you really up; there is you wanted.** |

-39-

| Welsh: | **Yeahhh, well.** |
|---|---|
| Floor Clerk: | **I am just saying!  I know the guy likes it higher, that's the only reason.  I'm trying to make you happy. . ."** |

297.  On January 10, 2008, Welsh is part of a conversation stating:

| Unidentified Person: | "Let's buy 50 Platinum here, **aggressively [i.e. get prices up]** |
|---|---|
| Welsh: | Okay |
| Unidentified Person: | **And let's buy 50 platinum and palladium on the closes."** |
| Welsh: | Okay""" |

298.  On January 10, 2008, Welsh transmits instructions to a NYMEX floor clerk **to cause new highs** in platinum futures by intentionally overpaying.

299.  The NYMEX Floor Clerk is also corrupt in stating that he is trying to make a new high for Welsh.

300.  Welsh tells the NYMEX floor clerk: "make sure its not calculated in [the closing volume-weighted average price and the spread settlement" He is obviously referring to certain trades that will not effect a higher price and therefore Welsh does not want it to be part of the settlement price calculations.

301.  Welsh continues to increase platinum prices as much as possible so that he can overpay for these contracts to make new highs.

302.  In a conversation on January 17, 2008, Welsh implies to a NYMEX floor clerk that he will be happy **"as long as it [platinum futures contracts] stays up there [referring to market prices].**

-40-

303.  Also on January 17, 2008, at the close of the day, Welsh discusses with a NYMEX floor clerk another NYMEX floor broker named **"Trig:"**

| | |
|---|---|
| Floor clerk: | "[To trading floor]: **Trig!** Buy 100 April |
| Welsh: | **Trig?!** Wow, what are you doing with **Trig?** |
| Floor Clerk: | . . .**He's the one that makes the good high prints [laughs knowingly]** |
| Welsh: | Yeah [Okay.} Trig's **banging us out here.** that's nice. |
| Floor Clerk: | That's what you want, right? |
| Welsh: | Yeah |
| Floor Clerk: | I know. |
| Welsh: | I am not complaining! |
| Floor Clerk | You bought 100 at 6.5 |
| Welsh: | 100 at 1566.5 |

MFG MCM 001715\Welsh\NYCMMS_WAV_3A38.wav.

304.  On January 18, 2008, Pia and Welsh continue to conspire to increase the price of NYMEX platinum:

| | |
|---|---|
| Pia: | "Buy 50 hard [force prices up] |
| Pia: | MOC |
| Welsh: K | |
| Pia: | Make it 100 |
| Welsh: K | |
| Pia: | **Make sure it [the prices] close up."** |

305.  On January 24, 2008 at the close of trading between 12:55 p.m. to 12:58 p.m Welsh conspires with a NYMEX Floor clerk as follows in part:

| | |
|---|---|
| Welsh: | **"How do we get a new high?"** |
| Floor Clerk: | In March? |
| Welsh: | Yeah. . . . |
| Welsh: | **Higher, the better** |
| Floor Clerk: | **I'll try and get as high as I could.  Alright. I'll call you back."** |

306.  These conversations show a complete disregard for market fundamentals which dictate that one tries to purchase at the lowest possible prices not the highest.

307.  However, because the goal of these recorded-defendants was to manipulate the market, and therefore increase settlement prices, they needed to buy at the highest possible prices.

308.  Once the settlement prices were manipulated and artificially increased, members of the public such as plaintiff herself, saw these increased settlement prices as a buy signals and poured capital into the platinum contract market which in turn continued to more prices up and up in a vicious, almost never ending cycle.

309.  By luring members of the public into the Platinum market such as Plaintiff, the open interests increased exponentially to almost 20,000 contracts from nearly zero in the April, 2008 Platinum contract, for example.

310.  Defendants therefore by manipulating the settlement prices were able to create liquidity for themselves so that they could then easily exit the market at a substantial profits for themselves.

311.  This pump and dump operation went on undeterred by the NYMEX defendants for over 95 trading days, from June, 2006 through December 31, 2008.

312.  The Moore defendants profited during the relevant time period in the amount of $54,000,000.00 based on their Platinum and Palladium holdings.

313.  This conduct amounted to a massive ponzi scheme.

314.  This conduct also is akin to insider trading where only the insiders know what is really happening, rather than the members of the public who are completely blind-sided.

315.  Indeed, by skewing prices in an upward direction, defendants were able to and did increase the prices of Platinum in an uneconomic way that deviated from actual supply and demand for Platinum from June, 2006 through December 31, 2008.

**Such Manipulative Conduct Caused the Prices of NYMEX Platinum to Increase Artificially from June, 2006 through the Summer of 2008.**

316.  Defendants' manipulative conduct caused the prices of NYMEX Platinum contracts to be higher than they otherwise would have been absent the manipulative conduct.

317.  The Volume Weighted Average Price of the Platinum Contracts purchased on behalf of Moore Capital was greater than or equal to the Platinum settlement prices on 93 out of the 95 trading days on which Moore capital made its end of trading platinum purchases.

318.  Moore Capital's end of day Platinum Contract Purchases made by Welsh and others was at a higher price on the floor market than the simultaneously available existing offers to sell that were posted on the Electronic Market.

319.  Defendants did not purchase the lower offers available in the electronic market when purchasing Platinum contracts from June, 2006 through June, 2008.

320. As a result of such conduct, the settlement prices for platinum increased from 2006 through part of 2008.

321. Defendants large orders of between 20 and 100 Platinum contracts in the last 120 seconds of trading NYMEX Platinum contracts constituted between approximately 6% and 28% of the average floor volume in Platinum for the entire day.

322. By waiting until the end of the day, defendants wanted illiquidity.

323. By waiting until the end of the trading session and refusing to use the electronic market, defendants intended and did artificially boost the prices of NYMEX Platinum.

324. By using the smaller floor market instead of the electronic market in the compressed time frame, defendants intended to artificially increase the price of NYMEX platinum.

325. This conduct described above artificially pushed the settlement prices of Platinum.

326. On 93 out of 95 (98%) bang the close trading days, the Volume Weighted Average Price ("VWAP" hereinafter) of defendants' purchases of NYMEX platinum futures contracts was higher than or equal to the VWAP settlement price of such Platinum contracts reported by NYMEX. See Exh.3.

327. On 94 out of the 95 (99%) bang the close trading days, one or more of the defendants purchases of NYMEX platinum futures contracts was higher than or equal to the VWAP settlement price of such Platinum contract as reported by NYMEX.

328. On 86 out of the 95 (91%) bang the close trading days, one or more of the defendants purchases of NYMEX platinum futures contract was higher than or equal to the high

price during the two minute settlement period of such contract as reported by the publicly available NYMEX time and sales data.

329. On 88 out of 95 bang the close trading days (93%), one or more of the defendants' purchases of NYMEX platinum futures contracts alleged above was higher than or equal to the price for such contract immediately prior to the two minute settlement period as reported by the publicly available NYMEX time and sales data.

330. These continued bang the close transactions by flooding the Floor of the Exchange with large buy orders during the last 120 seconds of trading caused the settlement prices of NYMEX Platinum to increase in an uneconomic and artificial manner.

331. By frequently and consistently injecting the unlawful, uneconomic and illegitimate buy orders to appear as if there was a large demand, defendants caused NYMEX platinum futures prices to be artificially high during the relevant time period, from at least June, 2006 at least June, 2008.

332. As a result of the artificially inflated prices of NYMEX platinum futures contract prices, the settlement prices of NYMEX platinum futures prices also artificially increased since the settlement prices are based on the VWAP of such contracts during the last 120 seconds of trading on the Floor of the Exchange..

333. Between November 1, 2007 and May 27, 2008, the lower execution price for defendant's end of day purchases of Platinum and Palladium futures contracts was higher than the highest offer to sell and the last offer to sell reflected on NYMEX data for best bids an asks on the electronic market during the two minute closing period on 70 days with respect to Platinum only and 115 trading days with respect to Platinum and Palladium during this time

-45-

period.

334. Because defendants used the higher prices in the pit, rather than the lower prices to purchase Platinum Futures Contracts on the Globex, offers were violated.

335. Because defendants used higher prices in the pit, rather than the lower prices for Platinum futures contracts on the Globex the Best Execution Rule was also violated.

336. On November 19, 2007, the Moore Defendants held 50 Platinum futures contracts. This long position steadily increased to 1,775 contracts by February 3, 2008.

337. Between February 5, 2008 and May 31, 2008, the Moore defendants platinum futures position fluctuated between 0 and 850 contacts.

338. On November 16, 2007, the Moore Defendants held 40,000 ounces of platinum bullion.

339. Beginning on February 4, 2008, the Moore Defendants began to hold substantial long positions in cash platinum as a result of large EFP transactions whereby they sold platinum futures contracts on the NYMEX and simultaneously acquired the actual physical bars of platinum.

340. On February 5, 2008, the Moore defendants held 148,750 ounces of platinum bullion.

341. The Moore defendants cash position in platinum increased to 182,250 ounces by March 4, 2008.

342. The Moore Defendants Physical Platinum position fluctuated between 22,500 ounces short and 77,500 ounces, during the relevant time frame herein.

343. The Moore Defendants holdings of more than one hundred thousand ounces

-46-

of Platinum meant that the Moore defendants experienced great gains on their overall holdings from increases in prices.

344. Thus, the Moore Defendants had a large incentive to inflate the prices of Platinum by inducing or enabling others to purchase, through the bang the close purchases and through other means.

345. On February 3, 2008, the Moore Defendants' Platinum futures long position had increased to 1775 contracts or 88,750 troy ounces. This large increase in the Moore Defendant's long position similarly increased the Moore Defendants financial motive to increase the price of platinum futures contracts.

346. The Moore Defendants holding 57,500 troy ounces of Platinum Bullion on February 3, 2008, for a total of 146,250 ounces would also have benefitted greatly from an increase in platinum prices.

347. A $100 per ounce increase in Platinum prices meant that the Moore Defendants would receive a gain of $14,625,000.00 (14 Million, Six Hundred and Twenty Five Thousand Dollars.)

348. Defendants Pia and Bacon traded NYMEX Platinum contracts for the Moore Macro Fund LLP ("MMF.")

349. These large Platinum positions held by MMF and FIF would benefit and did benefit from increases in Platinum prices.

350. The Moore Defendants enjoyed large gains during December, 2007 through February, 2008 as Platinum prices continued to climb to record highs. For example, from November, 2007 through February, 2008, Defendant Pia increased his Portfolio in excess of

-47-

$31,855,726 for the month of February, 2008.

351. In 2008, Defendant Bacon increased his portfolio's profit in excess of $70,000,000.

352. Defendants received large monetary compensation from achieving profits in connection with their Platinum Futures Contract holdings from 2006 through 2008.

353. Some of their compensation included: (1) fees and commission (2) increased revenues, (3) increased business (4) bonuses as additional forms of compensation which depended on profits earned.

354. MF Global received revenues and fees in connection with the purchase and/or sale of these Platinum Futures contracts as well.

355. MF Global employees were allowed and did have their own proprietary trading accounts and were permitted to make investments in Platinum Futures Contracts along with their customers, the Moore Defendants.

356. MF Global through their employees received substantial business and revenues from the Moore defendants.

357. The revenues earned by MF Global from the Moore Defendants was highly unusual because normally hedge funds such as Moore Capital spread out their business. In this case of executing such bang the close transactions, Moore Capital exclusively used employees of MF Global whom they obviously trusted to carry out this nefarious conduct.

358. Even a single large buy order can have a long term upward impact on prices. *E.g.* Robert E. Hothausen, Richard Leftwich and David Mayers, *The Effects of Large Block Transactions on Security Prices: A Cross-Sectional Analysis,* 19 J. Of FIN. ECON. 237, 240

(1987) ("Block transactions have permanent price effects if trade convey information, even if there are sufficient close substitutes to produce perfectly elastic excess demand curves."); Myron Scholes, *The Market for Securities: Substitution Versus Price Pressure and the Effects of Information on Share Prices*, 2 J. Of BUSINESS 179, 193-194 (1972); Andrei Shleifer, *Do demand Curves Slop Down?*, J. OF FINANCE 579, 580-582 (1986).

359. Typically the upward effects on prices of a large buy order do stay in the market for substantially longer than the downward effect on prices of a large sell order. *Id.*

360. Orders and executions of 20-100 contracts are very large for the floor market of the NYMEX platinum futures contract to handle.

361. Defendants made such large trades. For Platinum, on 5 days the orders were 25 contracts, on 46 days the orders were for 50 contracts, on 2 days the orders were for 75 contracts, and on 42 days the orders were for 100 contracts and on one day for 122 contracts.

362. These amounts are considered enormous and more than enough to skew the extremely illiquid Platinum market, as it did.

363. In fact, the Moore defendants held extremely large positions in NYMEX platinum from 2006 through 2008. At times the Moore defendants held NYMEX Platinum futures positions in a particular contract that constituted as much as 37% of the total open interest in that particular Platinum contract.

364. On six occasions from 2006 through 2008, Moore Capital held NYMEX platinum futures contracts that were in excess of 20% of the total open interest of that contract.

365. Further defendants entered long positions of NYMEX Platinum futures starting in June, 2006 and continued for approximately 2 years.

366. Defendants entered into more than just one large long position in Platinum, but frequently executed large buy orders of NYMEX Platinum futures contracts for at least eight consecutive months

367. These large buy orders made up a significant percentage of the trading volume on the day they were made.

368. As a result of defendants large percentage of the overall trading volume on the day and on the close, defendants trading had significant effects and did cause the increased prices of NYMEX Platinum.

369. Defendants' upward causal effect on prices of NYMEX Platinum is evidenced by the greatly increased prices of NYMEX Platinum after defendants' large buy trades started and greatly decreased after these trades ended.

370. Because these upward effects were artificial, the increase in prices was also artificial.

**Decline of the Platinum Market After the Manipulative**
**Conduct in the Spring, Summer and Fall of 2008**

371. After the manipulation stopped in June, 2008, the artificially high prices began to descend back to their normal levels based on supply and demand. See Exhibit 1.

372. At some point in 2008, the CFTC began investigating defendants conduct which halted the manipulative bang the close transactions.

373. Prior to the cessation of the manipulation, NYMEX Platinum futures contracts increased to all-time record levels of approximately $2200 per ounce from 2006 through part of 2008.

-50-

374. On October 26, 2007, as a result of the manipulation, NYMEX Platinum trades at $1472.10, per ounce, a record high.

375. By March 5, 2008, NYMEX Platinum traded at $2276,10 per troy ounce another record high.

376. Plaintiff expected NYMEX Platinum to increase to $2500 or $3000 by year end 2008 or early 2009 based on the information she had at the time.

377. In fact, out of the 89 trading days in NYMEX platinum from October 26, 2007 through March 5, 2008, there such contracts set new all-time record highs on 28 of those trading days.

378. The fundamentals of supply and demand for Platinum did not warrant such dramatic increases.

379. In fact, Platinum was in surplus, not in deficit in 2007 and 2008.

**Rapid Decline in the Prices of NYMEX Platinum**

380. After the manipulative conduct stopped sometime in 2008 when the CFTC investigation ramped up, the prices of NYMEX Platinum started to descend back to their normal prices based on supply and demand.

381. As such NYMEX Platinum contracts plummeted to under $1400 by August 19, 2008, and to $957 per ounce by October 3, 2008.

**Loss Causation With Respect o Ms. Levy's MF Global Customer Account**

382. Because Ms. Levy received a margin call on August 15, 2008, she had to cover her positions and by September, 2008 she had lost her entire platinum investment because of the sudden collapse of the Platinum Market.

383.  Because of the sudden collapse of the NYMEX Platinum Market, plaintiff had to liquidate her entire portfolio and just maintained two non-platinum contracts resulting in a loss of her entire investment of $364,000.000.

384.  Plaintiff claims damages and loss causation based on a fraud-on-the market theory of liability since platinum contracts were standardized contracts traded on the NYMEX futures exchange.

**Count I**

**MARKET MANIPULATION IN VIOLATION OF THE COMMODITIES EXCHANGE ACT 7 U.S.C. § 9, 17 C.F.R. §§§ 33.9, 33.10.**

**(With respect to All defendants)**

385.  Defendants through their acts alleged herein, from approximately June 6, 2006 through June 30, 2008 specifically intended to create unlawful and artificially high prices of NYMEX Platinum futures contracts in violation of 7 U.S.C. §9.

386.  All Defendants had the ability to artificially increase the prices of NYMEX Platinum from June 6, 2006 through the June 30, 2008.

387.  Defendants did artificially increase the prices of NYMEX platinum through their bang the close trades on at least 112 occasions during the relevant time frame herein.

388.  Defendants acted in bad faith and with the overriding ulterior motive of self-interest and financial gain to artificially increase the prices of NYMEX platinum by placing large orders of contracts ranging between 5 and 100 lots during the end of trading on the open outcry system.

389.  Defendants did artificially increase the prices of NYMEX platinum by using

-52-

phony MOC orders to allow the NYMEX floor brokers to unilaterally increase the asks on the close in the Pit in violation of the best execution rule.

390. Defendants, the NYMEX floor brokers and clerks acted with bad faith and overriding ulterior motive of financial gain by violating offers that were lower on the Globex, and only trading in the pit.

391. Defendants, the NYMEX floor clerks and brokers in bad faith and with the overriding ulterior motive of self-interest and financial gain did artificially increase the prices of NYMEX platinum by refusing to break down the large orders into smaller ones that should have been placed in small parts over the Globex to get the best execution.

391. Defendants, the NYMEX floor clerks and brokers in bad faith and with the overriding ulterior motive of self-interest and financial gain did artificially increase the prices of NYMEX platinum by telling the other defendants confidential information regarding the depth of market so that the Moore defendants could figure out how many contracts it needed to purchase to bang the close sufficiently.

392, As a result, the settlement prices continued to rise, and the members of the public including plaintiff decided to enter the market based on clear signals used in evaluating the market that there was a strong and rising market in Platinum in 2008 that would last until 2009 due to strong demand which is a buy signal.

393. From June 6, 2006 through the end of 2008, the prices of NYMEX Platinum contracts were artificially increased as a result of the manipulative conduct.

394. However, because the data was false and the settlement prices were fraudulent, plaintiff relied on manipulated data to enter a market that was really not rising at all

absent the extraordinary manipulation.

395.  Afer the manipulative conduct stopped due to the CFTC investigation in June, 2008, Platinum prices started to revert back to their normal, non-manipulated prices, causing the market to gyrate and drop precipitously causing Ms. Levy monetary damages.

## Count II

### FRAUD UNDER THE COMMODITIES EXCHANGE ACT
### 7 U.S.C. § 6, Et. Seq.
**(Against all defendants)**

396.  Defendants acted in bad faith with the overriding ulterior motive of self-interest and financial gain in Violating the Anti-Fraud Provisions of the Commodities Exchange Act proximately causing Ms. Levy monetary damages as follows:

**Violations of 7 U.S.C. §§6 & 13. Against All Defendants**

397.  Defendants jointly and severally, manipulated or attempted to manipulate the price of a commodity in interstate commerce by fraud, deception and the use of monopoly power, the commodity being NYMEX Platinum Futures Contracts purchased and sold from 2006 through 2008 sold for future delivery on Defendant Exchange.

398.  Defendants jointly and severally, cornered or attempted to corner and monopolized the buying and selling position of a commodity in interstate commerce, such commodity being the NYMEX Platinum Futures contracts from 2006 through 2008, sold for future delivery on the Defendant Exchange.

399.  Defendants jointly and severally, knowingly delivered or caused to be delivered for transmission through the mails or interstate commerce by telegraph, telephone, wireless, texting or other means of communication, false or misleading information or knowingly

inaccurate reports concerning NYMEX platinum and market information regarding prices of NYMEX Platinum.

400.  The aforesaid actions were in violation of Section 9 of the Commodities Exchange Act, as amended, 7 U.S.C. § 13, and Section 7 U.S.C.§ 6.

**Violations of 7 U.S.C. §6(b)(2)(A)- Cheating**

401.  Defendants did willfully cheat by executing at least 112 Platinum trades between June, 2006 and June, 2008 at the end of the trading day in an unlawful manner to artificially increase the settlement prices of Platinum, thus rendering the settlement prices higher than they normally would have been according to market supply and demand.

402.  Plaintiff interpreted the higher settlement prices of NYMEX Platinum as a clear buy signal and as a clear sign to enter the Platinum market.

403.  Because the increased prices of Platinum were due to these bang the close transactions, once defendants stopped manipulating the prices, the prices of NYMEX Platinum suddenly and rapidly collapsed in the summer of 2008 and continued to collapse to about $950 per troy ounce by the end of 2008.

404.  As a result, Plaintiff received a Margin Call on August 15, 2008 requiring her to liquidate her  platinum position, and she was required to sell off other non-platinum contracts as well by September, 2008, sustaining losses of approximately $364,000.00.

**Violations of 7 U.S.C. § 6b(a)(2)(B)-False Reports or Statements**

405.  Defendants willfully made false reports stating the inflated prices of the NYMEX Platinum Futures Contract closing prices on at least 112 occasions from June, 2006 through June, 2008 as follows:

NYMEX Enterprise defendants: By publishing the daily settlement prices on its website.

NYMEX Floor Brokers/Clerks- By filling out order tickets, street books and trading cards that reflected the inflated settlement prices of NYMEX Platinum.

MF GLOBAL-By sending daily statements to plaintiff stating the settlement price of NYMEX Platinum and posting such prices on its website.

As a result of publishing these false settlement prices, Plaintiff relied on this information and mistook it for legitimate and proper prices, when in fact the prices were the subject of market manipulation and were in fact false, causing her to lose her investment of $364,000.00.

**As Against All Defendants-Violations of 7 U.S.C. § 6B(a)(2(©**

406.  Defendants purposely deceived plaintiff into believing that the demand for Platinum was exponentially rising based on the ever-increasing settlement prices which under normal circumstances would have indicated increased demand.  However, in this case, the increase in daily prices were the results of market manipulation, not actual rising demand.

407.  Such deception, caused Plaintiff to enter the Platinum market believing that demand was strong and rising.

408.  As a result, when Platinum prices returned to their normal level, once the manipulation ceased, the Market crashed and Ms. Levy sustained damages as a result in the amount of not less than $364,000.00.

**Violation of 7 USC § 6E with Respect to Defendant Joseph Welsh**

409.  Defendant Joseph Welsh in violation of law acted as an unregistered Floor

-56-

broker in placing uneconomic orders to purchase Platinum on the Floor of the NYMEX between at least June, 2006 through June, 2008.

410. As a result of defendant Welsh's orders which he was unauthorized to place, since he was not registered as a Floor Broker, the settlement prices of NYMEX Platinum were caused to be manipulated.

411. As a result of said fraudulent conduct, defendants caused the prices to rise artificially and then collapse after the manipulative period, causing Plaintiff to sustain out of pocket damages of $364,000 damages in addition to lost profits.

**Violation of 7 USC § 6I (1) and NYMEX Rules**

412. Defendants violated 7 USC §6I and NYMEX Rules by violating position limits and or aiding and abetting such violations on several occasions between June ,2006 and June 2008 by possessing more Platinum contracts than they were allowed to own.

413. Defendants failed to report Platinum holdings in excess of position limits.

414. As such, defendants were able to continue to manipulate the Platinum Market by hoarding Platinum in violation of 7 USC 6 I.

415. As a result, Platinum prices artificially increased and then suddenly declined causing Plaintiff to sustain monetary losses.

**Violations of 7 USC 6o(1)(A)& (B), as against Defendants (Excluding CME governors)**

416. Because defendants were registered in various capacities enumerated under this provision, their conduct in banging the close of the settlement prices of NYMEX Platinum from approximately June, 2006 through June, 2008 violated this provision as it constituted an artifice to defraud and a deceit upon Plaintiff.

-57-

417.  As a result of such violations, Plaintiff was caused to lose her entire Platinum investment as well as some non-platinum investments that were pulled down long with her Platinum investments in the sum in excess of $364,000.00 as well as lost profits.

## Count III

### FAILURE TO MAINTAIN A STABLE AND OBJECTIVE CONTRACT MARKET AND BAD FAITH FAILURE TO ENFORCE ITS RULES AS WELL AS THE COMMODITIES EXCHANGE ACT IN VIOLATION OF 7 U.S.C. § 7(b), et. seq.

#### (As against the NYMEX Enterprise defendants)

418.  The NYMEX ENTERPRISE defendants including the CME Group Board of Governors failed to prevent this market manipulation of the Platinum Market for over 125 days when the evidence was so overwhelming that it could not have been missed due to mere negligence.

419.  Section 7 U.S.C.§ 7(b)(2) of the Commodities Exchange Act requires that contract markets or boards of trade protect the members of the public from the wrongful conduct at issue herein.

**"Prevention of market manipulation**

The board of trade shall have the capacity to prevent market manipulation through market surveillance, compliance, and enforcement practices and procedures, including methods for conducting real-time monitoring of trading and comprehensive accurate trade reconstructions."

Section 7 U.S.C. § 7(b)(3) states in pertinent part

:

**"Fair and equitable trading**

-58-

> The board of trade shall establish and enforce trading rules to
> ensure fair and equitable trading through the facilities of the
> contract market, and the capacity to detect, investigate and
> discipline any person that violates the rules.. . ."

420. From approximately June, 2006 through December 31, 2008, the NYMEX and CME board of governor defendants did not take any measures including emergency measures at is supposed to under 17 C.F.R.§ 1.41 to shut down trading in the corrupt Platinum market.

421. The NYMEX Enterprise defendants fell down on their duties to the members of the public in violation of 7 U.S.C. § 7, Et. Seq. to maintain a fair market where prices truly reflected market forces of supply and demand.

422. NYMEX and CME board of governors missed the obvious banging the close transactions that were right in front of their noses for at least 8 months.

423. At least one member of the CME group, Inc. Board of Governors appears to have a dominant ulterior motive of self-interest and financial gain amounting to a presumption of bad faith in failing to regulate and in failing to prevent the continued market manipulation.

424. Joseph Nicifaro was and is a member of the CME group board of governors and was a board of governor      in 2008.

425. As such, it was his duty to maintain a stable and orderly NYMEX Platinum market for the investing members of the public.

426. Apparently, it appears that in 2009 shortly after this manipulation ended and while the investigation into Christopher Pia was ongoing, Nicifaro accepted the position of Chief Executive Officer of the newly minted Pia Capital Fund, Inc. owned by Christopher Pia.

427.  As such, Nicifaro and Pia raised over $800 million dollars from investors.

428.  It was completely and totally inappropriate for a member of the governing board of the CME Group to accept this extremely lucrative position during a CFTC investigation that resulted in a fine against Pia for $1,000,000 for manipulation of the NYMEX Platinum Market.

429.  Mr. Nicifaro never should have accepted that job, while a member of the CME governing board..

430.  The extraordinary wealth and income generated as CEO of Pia Capital is obvious and clearly  raises a presumption of extreme bad faith, and overriding ulterior motive to look away from what Pia was doing at the time by blatantly banging the close.

431.  Mr. Nicifaro acceptance of that position as CEO of the Pia organization in such a close temporal proximity to the unlawful conduct, raises a clear presumption of an overriding ulterior motive of self-interest and personal financial gain and bad faith conduct allowing plaintiff to proceed against the NYMEX Enterprise defendants under 25 U.S.C. § 25(b)(4).  See also, Merrill Lynch v. Curran, 120 S. Ct. 1825, 456 U.S. 353 (1982).

432.  The fact that the CME group tried to cover this relationship up between Mr. Nicifaro and Mr. Pia by removing this crucial information regarding the too-cozy relationship ·between Nicifaro and Pia from the CME website recently, although such information had been on the website a few months ago, also shows fraudulent concealment and bad faith on the part of the CME group to cover up the obvious conflict of interest that one of their governing board members worked for Pia who had participated in such distasteful and unlawful conduct in connection with the Platinum market.

-60-

433.   Therefore, the board of governors of the CME group also acted with an overriding ulterior motive and in bad faith to preserve the status quo which is based on cronyism, at any cost including fairness to the members of the public including plaintiff herein.

434.   One can only infer from these extraordinary facts of Pia's offering of chief executive officer to Nicifaro that there was an overriding ulterior motive of financial gain in Nicifaro's failing to shut down Pia's trading in NYMEX plaintum.

## Count IV

## RESPONDEAT SUPERIOR

435.   Under common law, as well as 7 U.S.C.§ 2(a)(1)(A), defendants who are employers or principals are strictly liable and independently responsible for the actions of their employees or agents, and board of governors herein.

## Count V

## CONSPIRACY

436.  Defendants, their employees and/or agents entered into a conspiracy to manipulate the NYMEX Platinum Market from on or about June, 2006 through on or about June, 2008 as well as violate other provisions of law as listed in this Complaint, based on the conduct alleged herein and actually conducted such scheme in furtherance of the conspiracy, pursuant to which defendants shared substantial commissions and/or profits earned by the trading conduct as part of such conspiracy.

437.  Defendants their employees and/or agents entered into a conspiracy to defraud plaintiff by publishing false settlement prices for NYMEX Platinum futures contracts on

a daily basis from approximately June, 2006 through June, 2008.

438.  Defendants actually conducted such scheme in furtherance of the conspiracy, pursuant to which defendants shared substantial commissions and/or profits earned by the trading conduct as part of such conspiracy.

## Count VI

## AIDING AND ABETTING

439.  Defendants willfully participated in the schemes to Price Fix, defraud, manipulate and violate all laws enumerated herein with respect to the NYMEX Platinum market alleged herein, and were aware of their respective roles in such fraud and manipulative conduct, knowingly rendered substantial assistance in perpetrating such fraud and manipulation and and racketeering conduct without each defendants' assistance such fraud, manipulation and other enumerated conducted listed in this Complaint could not have succeeded.

## Count VII

## FRAUDULENT CONCEALMENT

440.  Because defendants willfully hid their unlawful conduct, Plaintiff's Statute of limitations is tolled from the time of learning of the CFTC Consent order Docket No. 10-09 (April 29, 2010), on or about September of 2010 based on this fraudulent concealment.

## Count VIII

## VIOLATIONS OF THE ANTITRUST LAWS, 15 U.S.C. § 1, ET. SEQ.

## Violations of 15 U.S.C. § 1-Contracts in Restraint of Trade as against all defendants

441.  The Moore Defendants, MF Global and the NYMEX defendants were each independent decision makers regarding whether to purchase or sell NYMEX Platinum.

442. Defendants, jointly and severally contracted, combined and conspired among themselves and among other persons or entities presently unknown to the plaintiff but well known to the defendants, in restraint of trade or commerce among the several states and the District of Columbia in connection with a commodity described as the NYMEX Platinum Futures Contracts available in 2008, as traded through the defendant Exchange.

443. The aforesaid contracts, combinations and conspiracy was in violation of Sections 1 and 3 of the Sherman Antitrust law and Common Law.

444. Defendants were independent competitors for the purchase and sale of NYMEX Platinum Futures Contracts which formed the relevant market herein.

445. As a result of said unlawful acts, Plaintiff is entitled to recover three fold the damages sustained by her, together with costs of suit, including reasonable attorneys fees, together with interest. Plaintiff has been damaged in an amount as yet undetermined but believed to be in excess of One Million Dollars. See Strobl v. NYMEX, 768 F. 2d 22 (2d Cir. 1985); **The Availability of Antitrust Treble Damages For Commodities Market Manipulation,** 54 FORDHAM LAW REVIEW, p. 853 (1986).

**Violations of the Sherman Act, 15 USC § 2-Monopolization Against All Defendants**

446. Defendants jointly and severally monopolized or attempted to monopolize and combined or conspired among themselves and among other persons and entities presently unknown to the Plaintiff but well know to the Defendants, to monopolize a part of the trade or commerce among several states of the United States or the District of Columbia, to wit: the interstate trading of NYMEX Platinum Futures Contracts from 2006 through 2008. The did so by controlling the prices of NYMEX Platinum through their bang the close transactions.

447. The aforesaid monopolization or attempted monopolization, combination or conspiracy was in violation of Section 2 of the Sherman Antitrust Act and Common Law.

448. As a result of said unlawful acts, the prices of platinum rose then suddenly dropped, causing damages. Thus, plaintiff is entitled to recover threefold damages sustained by her together with costs of suit, including reasonable attorneys fees, together with interest.

### Violations of the Clayton Act 15 USC § 13 Price Discrimination

449. Defendants jointly and severally discriminated in the prices charged to each other at the close of the trading day in NYMEX Platinum from 2006 through 2008 or attempted to and combined or conspired among themselves and among other persons and entities presently unknown to the Plaintiff but well know to the Defendants, to discriminate in price by artificially increasing the prices on the close and doing so through interstate commerce among several states of the United States or the District of Columbia. They did so by paying higher prices than were necessary due to market conditions. They did so in the interstate trading of NYMEX Platinum Future Contracts from 2006 through 2008.

450. The aforesaid price discrimination or attempted price discrimination or conspiracy was in violation of Section 13 of the Clayton Antitrust Act and Common Law.

451. As a result of said unlawful acts, Plaintiff is entitled to recover threefold damages sustained by her together with costs of suit, including reasonable attorneys fees, together with interest.

## Count IX

## VIOLATIONS OF THE RACKETEERING INFLUENCED AND CORRUPT ORGANIZATION ACT, 18 USC §§ 1961, ET. SEQ.

452. Defendants intentionally by combining, conspiring and artificially raising the prices of NYMEX Platinum in the Futures Market by placing banging the close transactions on the floor of the NYMEX on at least 112 occasions between June, 2006 through December 31, 2008 engaged in a pattern of Racketeering over at least a two year period.

453. The Manipulation appears to have continued except for the intervention of the CFTC who instituted and investigation initiated by the CFTC in 2008.

454. The Racketeering Enterprise as defined by 18 U.S.C. § 1964 consisted of the NYMEX Enterprise defendants, the Moore Enterprise Defendants and the MF Global Enterprise.

454. The persons, as defined by 18 U.S.C. § 1961(3) who conspired to and performed the Racketeering conduct consisted of Christopher Pia, Joseph Welsh, Louis Bacon, Eugene Berger, certain unnamed NYMEX Floor clerks and brokers and other persons ) presently unknown the Plaintiff, but well known to defendants.

454. Each individual defendant conducted a pattern of racketeering activity over a two year period in violation of 18 U.S.C. § 1961(5) by continuously participating in banging the close transactions that boosted artificially the prices of NYMEX Platinum future contracts on the close. As a result, the settlement prices also artificially increased causing investors to rush into the market.

455. Each individual defendant completed at least two predicate acts of Racketeering activities over this two year period.

456. These bang the close transactions constituted a scheme to defraud through interstate commerce as defined by the Mail Fraud and Wire Fraud acts under 18 USC § 1341 (mail fraud) and 18 USC § 1343 (wire fraud).

457. Defendants used the telephone lines to set up their bang the close transactions every time a call was placed between or among Pia, Welsh, Berger, and/or Bacon to each other or to the NYMEX Floor Brokers or Clerks in violation of 18 USC § 1343 and in excess of two occasions which is required to satisfy the RICO requirement that each defendant commit at least two predicate acts within a two year period.

458. The NYMEX Defendants also committed Wire Fraud by intentionally publishing the daily settlement prices of NYMEX Platinum on their websites and by sending out daily and monthly statements by use of the mails in violation of 18 U.S.C. § 1341 that stated the settlement prices of NYMEX Platinum which were false statements and therefore part of their scheme to defraud by use of the wires and mails.

459. Each defendant used the mails and phone lines or internet or mobile devices in interstate commerce more than two times in furtherance of this scheme to defraud from June, 2006 through June, 2008.

460. Each defendant engaged in laundering of monetary instruments in excess of $5000,00 at least two times in violation of 18 U.S.C. § 1956, engaging in monetary transactions in property derived from specified unlawful activity pursuant to 18 U.S.C. § 1957, and engaging in the interstate transportation of stolen money pursuant to 18 U.S.C.§ 2314.

461. With respect to Money Laundering in violation of 18 U.S.C. § 1957, each defendant herein conducted a financial transaction by purchasing NYMEX Platinum contracts on

at least 112 occasions at the close during the two year time period between June, 2006 and December 31, 2008.

462. Each of these 112 financial transactions involved proceeds of the unlawful banging the close transactions which resulted in monetary profits in the Moore defendant's account.

463. Each of these 112 financial transactions based on the unlawful banging the close transactions also resulted in fees and commission being generated in an unlawful manner for the NYMEX defendants and Defendant Joseph Welsh and MF Global as well.

464. Each individual defendant knew that these proceeds came from unlawful banging the close transactions.

465. Each individual defendant knew that the banging the close financial transaction was designed to conceal or disguise the unlawful source of the illicit profits.

466. Therefore, each individual defendant engaged in money laundering on at least 112 occasions during this two year window.

467. The Moore individual defendants engaged in the Interstate transportation of stolen property in violation of 18 U.S.C. § 2314 by transferring funds in excess of $5000 from their bank accounts to the NYMEX or to MF Global, their FCM as margin to purchase Platinum futures contracts.

468. MF Global and the NYMEX also transferred profits to the Moore defendants.

469. These monetary proceeds came from increased profits due to their banging the close transactions in the Platinum market which created profits in their accounts.

-67-

470. The Individual Defendants knew that these profits were illicit and in excess of $5000 and therefore each wire transfer establishes a predicate act of Interstate transportation of stolen property as well as wire fraud.

471. The repeated and continuing violations of 18 U.S.C. §§ 1956, 18 U.S.C.§ 1957 and 18 U.S.C. § 2314 were neither isolated nor sporadic events, but involved a callous and calculated series of repeated violations of law in order to conceal and promote criminal activity in the course of the continuing business of the Platinum Price-fixing Enterprise. These activities therefore constitute a further component of a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

472. As a result of this continuing racketeering conduct, plaintiff was caused to sustain severe monetary losses in her account for which she is entitled to threefold damages in excess of $364,000.00 dollars.

### STATE LAW AND COMMON LAW PENDANT CLAIMS

### Count X

### UNJUST ENRICHMENT

473. To the detriment of plaintiff, defendants have been unjustly enriched as a result of the unlawful conduct and/or wrongful conduct.

474. Defendants have unjustly benefitted through the purchase and sale of NYMEX Platinum contracts at inflated prices, which created an anti-competitive monopoly price for plaintiff.

475. Between the parties, it would be unjust for defendants to retain the benefits attained by their actions. Accordingly, Plaintiff seeks full restitution of defendants' enrichment,

-68-

benefits and ill-gotten gains acquired as a result of the unlawful and/or wrongful conduct alleged herein.

## Count XI

### NEGLIGENCE (Except as to the NYMEX defendants)

476.  Defendants negligently failed to maintain an orderly market for trading on an item of interstate commerce, to wit: to buy and sell NYMEX Platinum Future Contracts being bought and sold between 2006 and 2008.

477.  Defendants' negligence was in violation and in disregard of the duties imposed upon said Defendant Exchange, and under the terms and provisions of the Commodities Exchange Act.

478.  That as a result of said unlawful acts, Plaintiff, has been damaged in an amount as yet undetermined but believed to be in excess of One Million Dollars.

## COUNT XII

### BREACH OF FIDUCIARY DUTY

479.  Defendants had a fiduciary duty to honestly and fairly discharge their duties and responsibilities as Associated persons, floor brokers/clerks, Future Commission Merchants, Contract Markets and Boards of Trade.

480.  Defendants breached that duty by either willfully or through gross negligence and reckless disregard of their duties in bad faith, to incorrectly set the NYMEX Platinum Futures Contract Settlement Price for their own benefit and interest.

481  The acts of the defendants caused Plaintiff to be unable to correctly calculate

the true value of the NYMEX Platinum Futures Contract.

482. The acts of defendants made it impossible for plaintiff to predict the actual effects of supply and demand on the value of the Platinum Market and to adopt strategies to try to invest in NYMEX Platinum during the relevant time period.

483. Because of this breach of fiduciary duty, plaintiff accounts lost it's entire value and plaintiff lost profits as well.

## Count XIII

## BREACH OF CONTRACT

484. In 2006, Plaintiff entered into a Customer Agreement with defendant MF Global giving MF Global the right to purchase and sell NYMEX Platinum Futures contracts on Plaintiff's behalf over the NYMEX exchange in exchange for commissions.

485. In 2006, defendants MF Global and NYMEX entered into a contract whereby MF Global could purchase and sell NYMEX Platinum futures contracts directly over the NYMEX, a clearing house member in consideration for fees.

486. In 2008, plaintiff and NYMEX also had an agreement whereby it would allow plaintiff to purchase NYMEX contracts through her agent MF Global in exchange for Exchange fees. This agreement was not in writing and was an exception to the statute of frauds since it could be performed within one year.

487. The NYMEX floor brokers/clerks had employment agreements or verbal agreements to work as floor brokers at the NYMEX in consideration for the payment of a salary.

488. Plaintiff was a third-party beneficiary of the NYMEX floor broker agreement with the NYMEX exchange.

-70-

489. MF Global and the Moore defendants also entered into a customer agreement of which plaintiff was a third party beneficiary, since her account could be effected by their conduct under their customer agreement.

490. These contracts required each party to conduct itself in good faith in the purchase and sale of NYMEX futures contracts over the NYMEX and to deal fairly in connection with the performance of these contracts.

491. Defendants breached their duties to act under each contract in good faith by purposefully manipulating the settlement prices of NYMEX platinum on at least 112 occasions between June, 2006 and December, 2008 and therefore artificially increasing the price of NYMEX Platinum.

492. As a result, plaintiff was caused to sustain monetary damages in the amount of at least $364,000.00 in out of pocket losses plus lost profits and other punitive and treble damages.

## Count XIV

## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

### (As against, the Moore defendants, the NYMEX defendants and Joseph Welsh)

493. A business relationship existed between Plaintiff and MF Global, Inc. whereby MF Global in consideration for fees placed orders for the purchase and sale of NYMEX Platinum Futures Contracts over the NYMEX market for Ms. Levy's account.

494. Defendants were aware that MF Global had business relationships with other members of the public such as plaintiff involving the trading in Platinum for customers such as Ms. Levy.

-71-

495.  Defendants intentionally interfered with the business relationship between MF Global and Plaintiff, and acted with malicious intent and/or employed illegal means in so doing.

496.  By virtue of the foregoing, Plaintiff has been damaged in an amount to be established at trial, but believed to be substantially in excess of the jurisdictional limits of this court.

## Count XV

### VIOLATIONS OF THE MARTIN ACT, NY GEN BUS. LAW § 352, ET. SEQ[13].

497.  Defendants in continuing to manipulate the Platinum Market by artificially increasing the closing prices of NYMEX Platinum from June, 2006 through June, 2008 acted with deception, concealment, suppression, fraud and false pretenses in violation of the Martin Act, NY. Gen Business law § 352(1).

498.  As such, plaintiff has been damaged and seeks monetary damages in excess of the jurisdictional limits of this Court.

## Count XVI

### Deceptive Practices Act General Business Law § 349, Et. Seq.

499.  Plaintiff was a consumer of NYMEX Platinum Futures Contracts within the meaning of the New York Consumer Fraud and Deceptive Practices Act, § 349 of the General Business Law of the State of New York.

500.  Defendants employed unfair and deceptive practices in the conduct of trade

---

[13]  Recently the New York Court of Appeals has allowed a private right of action under the Martin Act. Assured Guarantee (UK), Ltd. v. J.P. Morgan Investment Management Inc., 18 N.Y.S. 341, 939 N.Y.S.2d 274 (2011).

or commerce by engaging in manipulative banging the close transactions in the NYMEX

Platinum Market on at least 112 occasions between 2006 and 2008.

501.  As a result, Ms. Levy sustained monetary damages and was caused to lose

her entire Platinum investment as well as other non-platinum future contract investments.

## Count XVII

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

502.  Based on the foregoing facts pled herein, defendants intentionally caused

Plaintiff great distress by purposefully setting her up to lose her savings by luring her into the

Platinum market in order to manipulate it and watch her account tank.

503.  Defendants purposefully needed to lure members of the public into the

Platinum market to create counter parties into this extremely illiquid market because every long

needs a short.

504.  By artificially inflating the settlement prices of NYMEX Platinum, Plaintiff

incorrectly believed that demand was very strong indicating a buy signal to her when in fact,

demand was actually lower than the supply at the time.

505.  Defendants engaged in these banging the close transactions in a callous

manner using disgusting profanities knowing that other members of the public also invested over

the NYMEX and were competing for Platinum contracts.

506.  Defendants engaged in this pump and dump operation at Plaintiff's expense

and intentionally caused her account to tank in the summer of 2008.

507.  Defendants knew or should have known that manipulation of the NYMEX

Platinum market would have devastating effects on other market participants including plaintiff.

-73-

508.  Defendants callously inflicted monetary damages onto Ms. Levy.

509.  As a result, Ms. Levy has suffered emotional distress with physical manifestations including but not limited to muscle pain, weight gain, an exacerbation of uvitis requiring prednisone eye drops, insomnia, anxiety, jaw-clenching and temporal mandibular joint dysfunction, requiring physical therapy, and the need to undergo acupuncture and acupressure. She was extremely upset by her Margin Call on August 15, 2008.

## Count XVIII

## JURY DEMAND

510.  Plaintiff requests a jury trial to resolve the outstanding issues in this case.

## COUNT XIX

## PUNITIVE DAMAGES

511.  By reason of the foregoing willful and unconscionable acts causing severe monetary losses and emotional distress and as a matter of public policy to punish defendants for such conduct and based on their extreme lack of contrition since at least one of the defendants knows and has known of plaintiff's claim for a long period of time and nobody has come forward to compensate her for these loses despite the overwhelming evidence in favor of compensation under the totality of the circumstances, punitive damages are sought in excess of the jurisdictional limits of this honorable Court to be determined at time of trial by a jury.

## DAMAGES AND OTHER RELIEF

Based on the foregoing, plaintiff was caused to lose her entire platinum investment in the amount of $280,000.00 as well as other non-platinum investments in the sum of $84,000.00 as well as future profits on these investments that plaintiff otherwise would have

-74-

earned; and as a result of the foregoing plaintiff has suffered monetary damages in excess of the

jurisdiction of the Court and in an amount to be determined and is entitled to recovery of such

damages as follows:

On the First, Second, Third, Forth, Fifth, Sixth, Seventh, Eleventh, Twelfth,

Thirteenth, Fifteen, Sixteenth Count- $364,000.00 plus pre and post judgment interest at New

York's Statutory Rate of 9% as well as lost profits.

On the Eight, Ninth, Fourteenth -treble damages to be determined at time of trial

but no less that $1,000,000.00

On the Tenth, Seventeenth, Nineteenth Count-to be determined at time of trial, but

in excess of the jurisdiction of this court.

On all counts including costs, interest, attorneys fees and disbursements

to be determined at the time of trial.


April 26, 2012


Susan Levy, Esq.
The Law Offices of Susan Levy
11 Broadway
Suite 615
New York, New York 10004
212-962-1782

**Bloomberg**

XPT Curncy (Platinum Spot $/Oz)



The BLOOMBERG PROFESSIONAL service, BLOOMBERG Data and BLOOMBERG Order Management Systems (the "Services") are owned and distributed locally by Bloomberg Finance L.P. ("BFLP") and its subsidiaries in all jurisdictions other than Argentina, Bermuda, China, India, Japan and Korea (the "BLP Countries"). BFLP is a wholly-owned subsidiary of Bloomberg L.P. ("BLP"). BLP provides BFLP with all global marketing and operational support and service for the Services and distributes the Services either directly or through a non-BFLP subsidiary in the BLP Countries. The Services include electronic trading and order-routing services, which are available only to sophisticated institutional investors and only where the necessary legal clearance has been obtained. BFLP, BLP and their affiliates do not provide investment advice or guarantee the accuracy of prices or information in the Services. Nothing on the Services shall constitute an offering of financial instruments by BFLP, BLP or their affiliates. BLOOMBERG, BLOOMBERG PROFESSIONAL, BLOOMBERG MARKET, BLOOMBERG NEWS, BLOOMBERG ANYWHERE, BLOOMBERG TRADEBOOK, BLOOMBERG BONDTRADER, BLOOMBERG TELEVISION, BLOOMBERG RADIO, BLOOMBERG PRESS and BLOOMBERG.COM are trademarks and service marks of BFLP, a Delaware limited partnership, or its subsidiaries.

Bloomberg ®Charts

1 - 1



| A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|
| Trade Date | Contract | Price | Volume | Volume Weighted Average Price (VWAP) | Moore Macro Fund/Fixed Income Fund | Pia/ Bacon |

| A<br>Trade<br>Date | B<br>Contract | C<br>Price | D<br>Volume | E<br>VWAP | F<br>MMF / FIF | G<br>Pia /<br>Bacon |
|---|---|---|---|---|---|---|
| 11/19/07 | 08F | 1458 | 50 | 1458 | MMF & | Bacon & |
| 11/20/07 | 08F | 1471 | 20 | - | MMF &<br>FIF | Bacon |
| 11/20/07 | 08F | 1469 | 5 | 1470.6 | MMF &<br>FIF | Bacon |
| 11/21/07 | 08F | 1472 | 50 | 1472 | MMF | Bacon |
| 11/27/07 | 08F | 1455 | 25 | 1455 | MMF | Bacon |
| 11/28/07 | 08F | 1442 | 30 | - | MMF | Pia |
| 11/28/07 | 08F | 1440 | 20 | 1441.2 | MMF | Pia |
| 11/30/07 | 08F | 1445 | 50 | 1445 | MMF | Bacon &<br>Pia |
| 12/03/07 | 08F | 1462.5 | 20 | - | MMF | Pia |
| 12/03/07 | 08F | 1461.8 | 5 | 1462.36 | MMF | Pia |
| 12/04/07 | 08F | 1473 | 25 | - | FIF | Bacon |
| 12/04/07 | 08F | 1472 | 25 | 1472.5 | FIF | Bacon |
| 12/05/07 | 08F | 1470 | 50 | 1470 | MMF | Pia |
| 12/06/07 | 08F | 1471.8 | 40 | - | MMF | Bacon |
| 12/06/07 | 08F | 1469 | 5 | - | MMF | Bacon |
| 12/06/07 | 08F | 1471.5 | 3 | - | MMF | Bacon |
| 12/06/07 | 08F | 1471.8 | 1 | - | MMF | Bacon |
| 12/06/07 | 08F | 1471.4 | 1 | 1471.49 | MMF | Bacon |
| 12/07/07 | 08F | 1463 | 50 | 1463 | MMF | Pia |
| 12/10/07 | 08F | 1467.5 | 50 | 1467.5 | MMF &<br>FIF | Bacon &<br>Pia |
| 12/12/07 | 08F | 1467.5 | 50 | - | MMF | Bacon &<br>Pia |
| 12/12/07 | 08F | 1480 | 50 | 1480 | MMF | Bacon &<br>Pia |
| 12/14/07 | 08F | 1480 | 75 | 1480 | MMF | Bacon |
| 12/17/07 | 08F | 1504 | 50 | 1504 | MMF | Pia |
| 12/18/07 | 08F | 1516 | 50 | 1516 | MMF | Pia |
| 12/21/07 | 08F | 1540 | 100 | 1540 | MMF | Bacon |
| 12/26/07 | 08J | 1544 | 40 | - | FIF | Bacon |
| 12/26/07 | 08J | 1543.5 | 10 | 1543.9 | FIF | Bacon |
| 12/27/07 | 08J | 1538 | 50 | 1538 | MMF | Bacon |
| 12/28/07 | 08J | 1542 | 25 | - | FIF | Bacon |
| 12/28/07 | 08J | 1541.8 | 25 | 1541.9 | FIF | Bacon |
| 12/31/07 | 08J | 1534.8 | 80 | - | MMF | Bacon |
| 12/31/07 | 08J | 1530 | 20 | 1533.84 | MMF | Bacon |
| 01/02/08 | 08J | 1548 | 50 | 1548 | MMF | Pia |
| 01/03/08 | 08J | 1552 | 89 | - | FIF | Bacon |

| 01/03/08 | 08J | 1550 | 11 | 1551.78 | FIF | Bacon |
|----------|-----|------|----|---------|-----|-------|
| 01/04/08 | 08J | 1548 | 50 | 1548 | MMF | Bacon |
| 01/07/08 | 08J | 1533 | 50 | 1533 | MMF | Pia |
| 01/08/08 | 08J | 1562 | 30 | - | MMF | Bacon |
| 01/08/08 | 08J | 1560 | 15 | - | MMF | Bacon |
| 01/08/08 | 08J | 1561.9 | 5 | 1561.39 | MMF | Bacon |
| 01/09/08 | 08J | 1559 | 50 | 1559 | FIF | Bacon |
| 01/10/08 | 08J | 1564 | 45 | - | MMF | Bacon |
| 01/10/08 | 08J | 1563.9 | 5 | 1563.99 | MMF | Bacon |
| 01/11/08 | 08J | 1570 | 40 | - | MMF | Bacon & Pia |
| 01/11/08 | 08J | 1569 | 10 | 1569.8 | MMF | Bacon & Pia |
| 01/14/08 | 08J | 1588 | 80 | - | MMF & FIF | Bacon & Pia |
| 01/14/08 | 08J | 1584 | 20 | 1587.2 | MMF & FIF | Bacon & Pia |
| 01/15/08 | 08J | 1587.5 | 50 | 1587.5 | FIF | Bacon |
| 01/17/08 | 08J | 1566.5 | 100 | 1566.5 | MMF | Bacon |
| 01/18/08 | 08J | 1567 | 85 | - | FIF | Bacon |
| 01/18/08 | 08J | 1564 | 10 | - | FIF | Bacon |
| 01/18/08 | 08J | 1566.9 | 5 | 1566.7 | FIF | Bacon |
| 01/22/08 | 08J | 1560 | 100 | 1560 | MMF | Bacon |
| 01/23/08 | 08J | 1560 | 75 | - | MMF | Pia |
| 01/23/08 | 08J | 1558.5 | 25 | 1559.63 | MMF | Pia |
| 01/24/08 | 08J | 1615 | 100 | 1615 | FIF | Bacon |
| 01/25/08 | 08J | 1683 | 100 | 1683 | MMF & FIF | Bacon |
| 01/28/08 | 08J | 1733 | 100 | 1733 | MMF | Bacon |
| 01/29/08 | 08J | 1725 | 100 | 1725 | MMF | Bacon |
| 01/30/08 | 08J | 1690 | 40 | - | MMF | Bacon |
| 01/30/08 | 08J | 1689.9 | 10 | 1689.98 | MMF | Bacon |
| 02/04/08 | 08J | 1798 | 50 | 1798 | FIF | Bacon |
| 02/05/08 | 08J | 1786 | 95 | - | MMF | Bacon |
| 02/05/08 | 08J | 1785.9 | 5 | 1786 | MMF | Bacon |
| 02/06/08 | 08J | 1820 | 93 | - | MMF & FIF | Bacon |
| 02/06/08 | 08J | 1819.9 | 7 | 1819.99 | MMF & FIF | Bacon |
| 02/07/08 | 08J | 1852 | 100 | 1852 | MMF | Pia |
| 02/08/08 | 08J | 1884.9 | 100 | 1884.9 | MMF | Bacon |

| | | | | | | |
|---|---|---|---|---|---|---|
| 02/11/08 | 08J | 1939.9 | 50 | 1939.9 | | Bacon |
| 02/12/08 | 08J | 1924 | 100 | 1924 | MMF | Pia |
| 02/13/08 | 08J | 1985 | 50 | 1985 | MMF | Bacon |
| 02/14/08 | 08J | 2007 | 80 | - | MMF | Bacon |
| 02/14/08 | 08J | 2005 | 20 | 2006.6 | MMF | Bacon |
| 02/15/08 | 08J | 2064 | 100 | 2064 | MMF | Bacon |
| 02/20/08 | 08J | 2140 | 100 | 2140 | MMF | Bacon |
| 02/21/08 | 08J | 2190 | 100 | 2190 | FIF | Bacon |
| 02/22/08 | 08J | 2170 | 100 | 2170 | FIF | Bacon |
| 02/25/08 | 08J | 2155 | 100 | 2155 | MMF | Bacon |
| 02/26/08 | 08J | 2150 | 100 | 2150 | MMF | Bacon |
| 02/27/08 | 08J | 2155 | 100 | 2155 | MMF & FIF | Bacon |
| 02/29/08 | 08J | 2185 | 95 | - | MMF | Bacon |
| 02/29/08 | 08J | 2180 | 5 | 2184.75 | MMF | Bacon |
| 03/03/08 | 08J | 2245 | 100 | 2245 | FIF | Bacon |
| 03/04/08 | 08J | 2275 | 50 | 2275 | MMF | Pia |
| 03/05/08 | 08J | 2286 | 100 | 2286 | FIF | Bacon |
| 03/06/08 | 08J | 2215 | 100 | 2215 | MMF | Bacon |
| 03/10/08 | 08J | 2049 | 85 | - | MMF | Bacon |
| 03/10/08 | 08J | 2035 | 10 | - | MMF | Bacon |
| 03/10/08 | 08J | 2040 | 5 | 2047.15 | MMF | Bacon |
| 03/20/08 | 08J | 1880 | 91 | - | MMF | Bacon |
| 03/20/08 | 08J | 1875 | 6 | - | MMF | Bacon |
| 03/20/08 | 08J | 1878 | 3 | 1879.64 | MMF | Bacon |
| 03/24/08 | 08J | 1890 | 50 | 1890 | FIF | Bacon |
| 03/26/08 | 08N | 2025 | 100 | 2025 | MMF | Bacon |
| 03/28/08 | 08N | 2055 | 95 | - | MMF | Pia |
| 03/28/08 | 08N | 2043 | 5 | 2054.4 | MMF | Pia |
| 03/31/08 | 08N | 2050 | 100 | 2050 | MMF | Pia |
| 04/01/08 | 08N | 1940 | 81 | - | FIF | Pia |
| 04/01/08 | 08N | 1939.5 | 10 | - | FIF | Pia |
| 04/01/08 | 08N | 1936 | 9 | 1939.59 | FIF | Pia |
| 04/03/08 | 08N | 2015 | 50 | 2015 | FIF | Bacon |
| 04/04/08 | 08N | 2035 | 25 | 2035 | MMF | Pia |
| 04/07/08 | 08N | 2048 | 50 | 2048 | MMF | Pia |
| 04/09/08 | 08N | 2048 | 100 | 2048 | FIF | Bacon |
| 04/10/08 | 08N | 2047 | 50 | 2047 | MMF | Bacon |
| 04/11/08 | 08N | 2029 | 50 | 2029 | MMF | Pia |
| 04/16/08 | 08N | 2040 | 50 | 2040 | MMF & | Bacon & |

| | | | | | FIF | Pia |
|---|---|---|---|---|---|---|
| 04/17/08 | 08N | 2063 | 50 | 2063 | MMF & FIF | Bacon & Pia |
| 04/18/08 | 08N | 2077.8 | 50 | 2077.8 | MMF & FIF | Bacon & Pia |
| 04/21/08 | 08N | 2030 | 50 | 2030 | MMF | Pia |
| 04/22/08 | 08N | 2037.8 | 50 | 2037.8 | MMF | Pia |
| 04/29/08 | 08N | 1942 | 48 | - | FIF | Bacon |
| 04/29/08 | 08N | 1940 | 2 | 1941.92 | FIF | Bacon |
| 04/30/08 | 08N | 1938 | 25 | 1938 | FIF | Bacon |
| 05/01/08 | 08N | 1886 | 33 | - | MMF | Pia |
| 05/01/08 | 08N | 1882 | 17 | 1884.64 | MMF | Pia |
| 05/02/08 | 08N | 1910 | 50 | 1910 | FIF | Bacon |
| 05/06/08 | 08N | 1974 | 50 | 1974 | MMF | Pia |
| 05/07/08 | 08N | 1970 | 50 | 1970 | FIF | Bacon |
| 05/08/08 | 08N | 2045 | 100 | 2045 | FIF | Bacon |
| 05/09/08 | 08N | 2110 | 100 | 2110 | FIF | Bacon |
| 05/12/08 | 08N | 2130 | 100 | 2130 | MMF | Bacon |
| 05/13/08 | 08N | 2073.5 | 50 | 2073.5 | MMF | Bacon |
| 05/14/08 | 08N | 2039.5 | 75 | 2039.5 | MMF | Bacon & Pia |
| 05/15/08 | 08N | 2077.5 | 100 | 2077.5 | MMF | Bacon |
| 05/16/08 | 08N | 2132 | 100 | 2132 | MMF | Bacon & Pia |
| 05/19/08 | 08N | 2165 | 50 | 2165 | FIF | Bacon |
| 05/20/08 | 08N | 2150 | 100 | 2150 | FIF | Bacon |
| 05/21/08 | 08N | 2224 | 50 | 2224 | MMF & FIF | Bacon |

169.    On 93 out of the 95 (98%) bang the close trading days, the VWAP of Moore Capital's purchase(s) of NYMEX platinum futures contracts alleged in ¶¶167-168 above was higher than or equal to the VWAP settlement price of such contract as reported by the NYMEX. Sub-paragraphs "a" – "oooo" below allege each of these 93 days.

> a.  November 19, 2007
> b.  November 20, 2007
> c.  November 21, 2007
> d.  November 27, 2007
> e.  November 28, 2007

Exhibit 2

| Trade Date | PL / PA | Contract | Moore Purchase Price | Volume | Settlement Price | Moore Purchase Price - Settlement Price |
|---|---|---|---|---|---|---|
| 11/19/07 | PL | Jan-08 | 1458 | 50 | 1457.1 | 0.9 |
| 11/20/07 | PL | Jan-08 | 1471 | 20 | 1469.7 | 1.3 |
| 11/21/07 | PL | Jan-08 | 1472 | 50 | 1467.2 | 4.8 |
| 11/27/07 | PL | Jan-08 | 1455 | 25 | 1453.5 | 1.5 |
| 11/28/07 | PL | Jan-08 | 1440 | 20 | 1438.3 | 1.7 |
| 11/28/07 | PL | Jan-08 | 1442 | 30 | 1438.3 | 3.7 |
| 11/30/07 | PL | Jan-08 | 1445 | 50 | 1444.1 | 0.9 |
| 12/03/07 | PL | Jan-08 | 1461.8 | 5 | 1461.4 | 0.4 |
| 12/03/07 | PL | Jan-08 | 1462.5 | 20 | 1461.4 | 1.1 |
| 12/04/07 | PL | Jan-08 | 1473 | 25 | 1472.3 | 0.7 |
| 12/05/07 | PL | Jan-08 | 1470 | 50 | 1468.3 | 1.7 |
| 12/06/07 | PL | Jan-08 | 1471.4 | 1 | 1470.2 | 1.2 |
| 12/06/07 | PL | Jan-08 | 1471.5 | 3 | 1470.2 | 1.3 |
| 12/06/07 | PL | Jan-08 | 1471.8 | 40 | 1470.2 | 1.6 |
| 12/06/07 | PL | Jan-08 | 1471.8 | 1 | 1470.2 | 1.6 |
| 12/07/07 | PL | Jan-08 | 1463 | 50 | 1462.2 | 0.8 |
| 12/10/07 | PL | Jan-08 | 1467.5 | 50 | 1466.3 | 1.2 |
| 12/12/07 | PL | Jan-08 | 1480 | 50 | 1479.8 | 0.2 |
| 12/14/07 | PL | Jan-08 | 1480 | 75 | 1479.2 | 0.8 |
| 12/17/07 | PL | Jan-08 | 1504 | 50 | 1503.6 | 0.4 |
| 12/18/07 | PL | Jan-08 | 1516 | 50 | 1515.3 | 0.7 |
| 12/21/07 | PL | Jan-08 | 1540 | 100 | 1536.3 | 3.7 |
| 12/26/07 | PL | Apr-08 | 1543.5 | 10 | 1543 | 0.5 |
| 12/26/07 | PL | Apr-08 | 1544 | 40 | 1543 | 1 |
| 12/27/07 | PL | Apr-08 | 1538 | 50 | 1536.6 | 1.4 |
| 12/28/07 | PL | Apr-08 | 1541.8 | 25 | 1539.5 | 2.3 |
| 12/28/07 | PL | Apr-08 | 1542 | 25 | 1539.5 | 2.5 |
| 12/31/07 | PL | Apr-08 | 1530 | 20 | 1525.4 | 4.6 |
| 12/31/07 | PL | Apr-08 | 1534.8 | 80 | 1525.4 | 9.4 |
| 01/02/08 | PL | Apr-08 | 1548 | 50 | 1546 | 2 |
| 01/03/08 | PL | Apr-08 | 1552 | 89 | 1551.8 | 0.2 |
| 01/04/08 | PL | Apr-08 | 1548 | 50 | 1547.1 | 0.9 |
| 01/07/08 | PL | Apr-08 | 1533 | 50 | 1531.1 | 1.9 |

| Trade Date | PL / PA | Contract | Moore Purchase Price | Volume | Settlement Price | Moore Purchase Price - Settlement Price |
|---|---|---|---|---|---|---|
| 01/08/08 | PL | Apr-08 | 1561.9 | 5 | 1560.5 | 1.4 |
| 01/08/08 | PL | Apr-08 | 1562 | 30 | 1560.5 | 1.5 |
| 01/09/08 | PL | Apr-08 | 1559 | 50 | 1558.3 | 0.7 |
| 01/10/08 | PL | Apr-08 | 1563.9 | 5 | 1563.7 | 0.2 |
| 01/10/08 | PL | Apr-08 | 1564 | 45 | 1563.7 | 0.3 |
| 01/11/08 | PL | Apr-08 | 1570 | 40 | 1569.4 | 0.6 |
| 01/14/08 | PL | Apr-08 | 1584 | 20 | 1584 | 0 |
| 01/14/08 | PL | Apr-08 | 1588 | 80 | 1584 | 4 |
| 01/15/08 | PL | Apr-08 | 1587.5 | 50 | 1585.5 | 2 |
| 01/17/08 | PL | Apr-08 | 1566.5 | 100 | 1565.8 | 0.7 |
| 01/18/08 | PL | Apr-08 | 1566.9 | 5 | 1565.5 | 1.4 |
| 01/18/08 | PL | Apr-08 | 1567 | 85 | 1565.5 | 1.5 |
| 01/22/08 | PL | Apr-08 | 1560 | 100 | 1558.6 | 1.4 |
| 01/23/08 | PL | Apr-08 | 1560 | 75 | 1559.1 | 0.9 |
| 01/24/08 | PL | Apr-08 | 1615 | 100 | 1613 | 2 |
| 01/25/08 | PL | Apr-08 | 1683 | 100 | 1680.1 | 2.9 |
| 01/28/08 | PL | Apr-08 | 1733 | 100 | 1728.7 | 4.3 |
| 01/29/08 | PL | Apr-08 | 1725 | 100 | 1721.9 | 3.1 |
| 01/30/08 | PL | Apr-08 | 1689.9 | 10 | 1687.4 | 2.5 |
| 01/30/08 | PL | Apr-08 | 1690 | 40 | 1687.4 | 2.6 |
| 02/04/08 | PL | Apr-08 | 1798 | 50 | 1797.6 | 0.4 |
| 02/05/08 | PL | Apr-08 | 1785.9 | 5 | 1785.5 | 0.4 |
| 02/05/08 | PL | Apr-08 | 1786 | 95 | 1785.5 | 0.5 |
| 02/06/08 | PL | Apr-08 | 1819.9 | 7 | 1819 | 0.9 |
| 02/06/08 | PL | Apr-08 | 1820 | 93 | 1819 | 1 |
| 02/07/08 | PL | Apr-08 | 1852 | 100 | 1851.4 | 0.6 |
| 02/08/08 | PL | Apr-08 | 1884.9 | 100 | 1884 | 0.9 |
| 02/11/08 | PL | Apr-08 | 1939.9 | 50 | 1939.4 | 0.5 |
| 02/12/08 | PL | Apr-08 | 1924 | 100 | 1921.8 | 2.2 |
| 02/13/08 | PL | Apr-08 | 1985 | 50 | 1983.7 | 1.3 |
| 02/14/08 | PL | Apr-08 | 2007 | 80 | 2005.9 | 1.1 |
| 02/15/08 | PL | Apr-08 | 2064 | 100 | 2063.7 | 0.3 |
| 02/20/08 | PL | Apr-08 | 2140 | 100 | 2138.8 | 1.2 |

| Trade Date | PL / PA | Contract | Moore Purchase Price | Volume | Settlement Price | Moore Purchase Price - Settlement Price |
|---|---|---|---|---|---|---|
| 02/21/08 | PL | Apr-08 | 2190 | 100 | 2188.2 | 1.8 |
| 02/22/08 | PL | Apr-08 | 2170 | 100 | 2167.8 | 2.2 |
| 02/25/08 | PL | Apr-08 | 2155 | 100 | 2153.5 | 1.5 |
| 02/27/08 | PL | Apr-08 | 2155 | 100 | 2152.3 | 2.7 |
| 02/29/08 | PL | Apr-08 | 2185 | 95 | 2180.7 | 4.3 |
| 03/03/08 | PL | Apr-08 | 2245 | 100 | 2241.6 | 3.4 |
| 03/04/08 | PL | Apr-08 | 2275 | 50 | 2267 | 8 |
| 03/05/08 | PL | Apr-08 | 2286 | 100 | 2276.1 | 9.9 |
| 03/06/08 | PL | Apr-08 | 2215 | 100 | 2200.8 | 14.2 |
| 03/10/08 | PL | Apr-08 | 2040 | 5 | 2039.1 | 0.9 |
| 03/10/08 | PL | Apr-08 | 2049 | 85 | 2039.1 | 9.9 |
| 03/20/08 | PL | Apr-08 | 1878 | 3 | 1877.3 | 0.7 |
| 03/20/08 | PL | Apr-08 | 1880 | 91 | 1877.3 | 2.7 |
| 03/24/08 | PL | Apr-08 | 1890 | 50 | 1889.2 | 0.8 |
| 03/26/08 | PL | Jul-08 | 2025 | 100 | 2022.9 | 2.1 |
| 03/28/08 | PL | Jul-08 | 2055 | 95 | 2048.8 | 6.2 |
| 03/31/08 | PL | Jul-08 | 2050 | 100 | 2043.4 | 6.6 |
| 04/01/08 | PL | Jul-08 | 1939.5 | 10 | 1937.8 | 1.7 |
| 04/01/08 | PL | Jul-08 | 1940 | 81 | 1937.8 | 2.2 |
| 04/03/08 | PL | Jul-08 | 2015 | 50 | 2012.9 | 2.1 |
| 04/04/08 | PL | Jul-08 | 2035 | 25 | 2030.5 | 4.5 |
| 04/07/08 | PL | Jul-08 | 2048 | 50 | 2046.9 | 1.1 |
| 04/09/08 | PL | Jul-08 | 2048 | 100 | 2044.6 | 3.4 |
| 04/10/08 | PL | Jul-08 | 2047 | 50 | 2045 | 2 |
| 04/11/08 | PL | Jul-08 | 2029 | 50 | 2028.1 | 0.9 |
| 04/16/08 | PL | Jul-08 | 2040 | 50 | 2037.3 | 2.7 |
| 04/17/08 | PL | Jul-08 | 2063 | 50 | 2061.5 | 1.5 |
| 04/18/08 | PL | Jul-08 | 2077.8 | 50 | 2071.3 | 6.5 |
| 04/21/08 | PL | Jul-08 | 2030 | 50 | 2027.3 | 2.7 |
| 04/22/08 | PL | Jul-08 | 2037.8 | 50 | 2037.4 | 0.4 |
| 04/29/08 | PL | Jul-08 | 1942 | 48 | 1940.1 | 1.9 |
| 04/30/08 | PL | Jul-08 | 1938 | 25 | 1935.2 | 2.8 |
| 05/01/08 | PL | Jul-08 | 1886 | 33 | 1882.3 | 3.7 |

| Trade Date | PL / PA | Contract | Moore Purchase Price | Volume | Settlement Price | Moore Purchase Price - Settlement Price |
|---|---|---|---|---|---|---|
| 05/02/08 | PL | Jul-08 | 1910 | 50 | 1908.2 | 1.8 |
| 05/06/08 | PL | Jul-08 | 1974 | 50 | 1969.8 | 4.2 |
| 05/07/08 | PL | Jul-08 | 1970 | 50 | 1969 | 1 |
| 05/08/08 | PL | Jul-08 | 2045 | 100 | 2042.3 | 2.7 |
| 05/09/08 | PL | Jul-08 | 2110 | 100 | 2101.8 | 8.2 |
| 05/12/08 | PL | Jul-08 | 2130 | 100 | 2123.3 | 6.7 |
| 05/13/08 | PL | Jul-08 | 2073.5 | 50 | 2073.4 | 0.1 |
| 05/14/08 | PL | Jul-08 | 2039.5 | 75 | 2039.1 | 0.4 |
| 05/15/08 | PL | Jul-08 | 2077.5 | 100 | 2076.9 | 0.6 |
| 05/16/08 | PL | Jul-08 | 2132 | 100 | 2132 | 0 |
| 05/19/08 | PL | Jul-08 | 2165 | 50 | 2158.2 | 6.8 |
| 05/20/08 | PL | Jul-08 | 2150 | 100 | 2147.8 | 2.2 |
| 05/21/08 | PL | Jul-08 | 2224 | 50 | 2221.1 | 2.9 |

Platinum Contract Expiring April 2008
Electronic Trading, Pit Trading and Open Interest
From Inception to Conclusion

| Date | Electronic Trading | Pit Trading | Total Trading | Open Interest |
|---|---|---|---|---|
| 14-Aug-07 | 1 | | 1 | 0 |
| 15-Aug-07 | | | 0 | 1 |
| 16-Aug-07 | | | 0 | 1 |
| 17-Aug-07 | 1 | | 1 | 2 |
| 20-Aug-07 | | | 0 | 2 |
| 21-Aug-07 | | | 0 | 2 |
| 22-Aug-07 | | | 0 | 2 |
| 23-Aug-07 | | | 0 | 2 |
| 24-Aug-07 | | | 0 | 2 |
| 27-Aug-07 | | | 0 | 2 |
| 28-Aug-07 | | | 0 | 2 |
| 29-Aug-07 | | | 0 | 2 |
| 30-Aug-07 | | | 0 | 2 |
| 31-Aug-07 | | | 0 | 2 |
| 4-Sep-07 | | | 0 | 2 |
| 5-Sep-07 | | | 0 | 2 |
| 6-Sep-07 | | | 0 | 2 |
| 7-Sep-07 | | | 0 | 2 |
| 10-Sep-07 | | | 0 | 2 |
| 11-Sep-07 | | | 0 | 2 |
| 12-Sep-07 | | | 0 | 2 |
| 13-Sep-07 | | | 0 | 2 |
| 14-Sep-07 | | | 0 | 2 |
| 17-Sep-07 | | | 0 | 2 |
| 18-Sep-07 | 1 | | 1 | 3 |
| 19-Sep-07 | | | 0 | 3 |
| 20-Sep-07 | | 1 | 1 | 4 |
| 21-Sep-07 | | | 0 | 4 |
| 24-Sep-07 | 1 | | 1 | 4 |
| 25-Sep-07 | 3 | | 3 | 7 |
| 26-Sep-07 | 10 | | 10 | 11 |
| 27-Sep-07 | 24 | | 24 | 25 |
| 28-Sep-07 | 1 | | 1 | 25 |
| 1-Oct-07 | 13 | 1 | 14 | 31 |
| 2-Oct-07 | 5 | | 5 | 36 |
| 3-Oct-07 | | | 0 | 36 |
| 4-Oct-07 | | 1 | 1 | 35 |
| 5-Oct-07 | 3 | | 3 | 38 |
| 8-Oct-07 | 5 | 5 | 10 | 43 |
| 9-Oct-07 | | | 0 | 43 |
| 10-Oct-07 | 5 | 5 | 10 | 48 |
| 11-Oct-07 | 2 | 2 | 4 | 48 |
| 12-Oct-07 | 36 | | 36 | 84 |
| 15-Oct-07 | | | 0 | 84 |
| 16-Oct-07 | 29 | 29 | 58 | 112 |
| 17-Oct-07 | 40 | | 40 | 142 |
| 18-Oct-07 | 10 | | 10 | 152 |

Source: Bloomberg LLP

**Platinum Contract Expiring April 2008**
**Electronic Trading, Pit Trading and Open Interest**
**From Inception to Conclusion**

| Date | Electronic Trading | Pit Trading | Total Trading | Open Interest |
|---|---|---|---|---|
| 19-Oct-07 | | | 0 | 152 |
| 22-Oct-07 | | | 0 | 152 |
| 23-Oct-07 | | | 0 | 152 |
| 24-Oct-07 | 1 | | 1 | 153 |
| 25-Oct-07 | 2 | 2 | 4 | 155 |
| 26-Oct-07 | 7 | 1 | 8 | 163 |
| 29-Oct-07 | 6 | 6 | 12 | 166 |
| 30-Oct-07 | 4 | 4 | 8 | 169 |
| 31-Oct-07 | | | 0 | 169 |
| 1-Nov-07 | 2 | 2 | 4 | 169 |
| 2-Nov-07 | 4 | | 4 | 173 |
| 5-Nov-07 | 3 | 2 | 5 | 175 |
| 6-Nov-07 | 6 | 2 | 8 | 177 |
| 7-Nov-07 | 10 | | 10 | 185 |
| 8-Nov-07 | 13 | 16 | 29 | 195 |
| 9-Nov-07 | 20 | | 20 | 210 |
| 12-Nov-07 | 10 | 20 | 30 | 216 |
| 13-Nov-07 | 9 | | 9 | 217 |
| 14-Nov-07 | 48 | 50 | 98 | 297 |
| 15-Nov-07 | 13 | 117 | 130 | 355 |
| 16-Nov-07 | 42 | | 42 | 382 |
| 19-Nov-07 | 2 | 2 | 4 | 383 |
| 20-Nov-07 | 9 | 12 | 21 | 376 |
| 21-Nov-07 | 1 | 1 | 2 | 374 |
| 23-Nov-07 | 6 | | 6 | 377 |
| 26-Nov-07 | 28 | 140 | 168 | 439 |
| 27-Nov-07 | 40 | 40 | 80 | 439 |
| 28-Nov-07 | 35 | 35 | 70 | 450 |
| 29-Nov-07 | 231 | 695 | 926 | 836 |
| 30-Nov-07 | 470 | 363 | 833 | 1,168 |
| 3-Dec-07 | 572 | 543 | 1,115 | 1,760 |
| 4-Dec-07 | 188 | 73 | 261 | 1,855 |
| 5-Dec-07 | 72 | 111 | 183 | 1,840 |
| 6-Dec-07 | 115 | 208 | 323 | 2,024 |
| 7-Dec-07 | 33 | 7 | 40 | 2,027 |
| 10-Dec-07 | 149 | 76 | 225 | 2,128 |
| 11-Dec-07 | 387 | 3 | 390 | 2,475 |
| 12-Dec-07 | | 444 | 444 | 2,887 |
| 13-Dec-07 | | 251 | 251 | 3,035 |
| 14-Dec-07 | 512 | | 512 | 3,338 |
| 17-Dec-07 | | 616 | 616 | 3,765 |
| 18-Dec-07 | 1,072 | 410 | 1,482 | 4,770 |
| 19-Dec-07 | 504 | 230 | 734 | 5,157 |
| 20-Dec-07 | 2,216 | 685 | 2,901 | 7,330 |
| 21-Dec-07 | 2,898 | 1,082 | 3,980 | 9,566 |
| 24-Dec-07 | 818 | 283 | 1,101 | 10,366 |
| 26-Dec-07 | 1,894 | 790 | 2,684 | 12,355 |
| 27-Dec-07 | 2,937 | 1,669 | 4,606 | 14,856 |
| 28-Dec-07 | 1,994 | 567 | 2,561 | 16,644 |

Source: Bloomberg LLP

Platinum Contract Expiring April 2008
Electronic Trading, Pit Trading and Open Interest
From Inception to Conclusion

| Date | Electronic Trading | Pit Trading | Total Trading | Open Interest |
|---|---|---|---|---|
| 31-Dec-07 | 771 | 372 | 1,143 | 17,011 |
| 2-Jan-08 | 1,395 | 340 | 1,735 | 17,808 |
| 3-Jan-08 | 1,251 | 486 | 1,737 | 17,964 |
| 4-Jan-08 | 991 | 214 | 1,205 | 18,034 |
| 7-Jan-08 | 1,289 | 140 | 1,429 | 18,227 |
| 8-Jan-08 | 1,422 | 901 | 2,323 | 19,148 |
| 9-Jan-08 | 1,254 | 1,482 | 2,736 | 18,938 |
| 10-Jan-08 | 2,191 | 1,063 | 3,254 | 19,042 |
| 11-Jan-08 | 857 | 242 | 1,099 | 18,697 |
| 14-Jan-08 | 1,719 | 936 | 2,655 | 17,702 |
| 15-Jan-08 | 903 | 135 | 1,038 | 17,630 |
| 16-Jan-08 | 1,362 | 398 | 1,760 | 17,637 |
| 17-Jan-08 | 1,585 | 619 | 2,204 | 17,092 |
| 18-Jan-08 | 1,200 | 177 | 1,377 | 16,920 |
| 22-Jan-08 | 3,540 | 509 | 4,049 | 16,498 |
| 23-Jan-08 | 1,071 | 279 | 1,350 | 16,916 |
| 24-Jan-08 | 3,316 | 1,282 | 4,598 | 16,856 |
| 25-Jan-08 | 4,161 | 698 | 4,859 | 16,214 |
| 28-Jan-08 | 3,343 | 765 | 4,108 | 16,406 |
| 29-Jan-08 | 3,420 | 811 | 4,231 | 16,295 |
| 30-Jan-08 | 1,623 | 445 | 2,068 | 16,666 |
| 31-Jan-08 | 2,275 | 907 | 3,182 | 17,216 |
| 1-Feb-08 | 2,133 | 161 | 2,294 | 17,432 |
| 4-Feb-08 | 1,373 | 2,114 | 3,487 | 16,310 |
| 5-Feb-08 | 2,206 | 2,196 | 4,402 | 15,225 |
| 6-Feb-08 | 2,045 | 771 | 2,816 | 15,285 |
| 7-Feb-08 | 2,016 | 227 | 2,243 | 15,317 |
| 8-Feb-08 | 1,791 | 311 | 2,102 | 15,566 |
| 11-Feb-08 | 3,095 | 1,808 | 4,903 | 14,914 |
| 12-Feb-08 | 2,776 | 261 | 3,037 | 14,583 |
| 13-Feb-08 | 3,849 | 701 | 4,550 | 14,880 |
| 14-Feb-08 | 3,015 | 221 | 3,236 | 14,774 |
| 15-Feb-08 | 2,833 | 185 | 3,018 | 14,778 |
| 19-Feb-08 | 4,859 | 862 | 5,721 | 15,502 |
| 20-Feb-08 | 4,118 | 440 | 4,558 | 15,891 |
| 21-Feb-08 | 4,164 | 921 | 5,085 | 15,533 |
| 22-Feb-08 | 2,504 | 189 | 2,693 | 14,915 |
| 25-Feb-08 | 2,138 | 277 | 2,415 | 14,817 |
| 26-Feb-08 | 3,812 | 781 | 4,593 | 14,746 |
| 27-Feb-08 | 2,030 | 626 | 2,656 | 13,979 |
| 28-Feb-08 | 2,581 | 550 | 3,131 | 13,738 |
| 29-Feb-08 | 2,653 | 296 | 2,949 | 13,671 |
| 3-Mar-08 | 3,141 | 910 | 4,051 | 13,988 |
| 4-Mar-08 | 3,282 | 621 | 3,903 | 13,204 |
| 5-Mar-08 | 4,627 | 443 | 5,070 | 12,793 |
| 6-Mar-08 | 3,130 | 241 | 3,371 | 12,488 |
| 7-Mar-08 | 4,607 | 550 | 5,157 | 11,791 |
| 10-Mar-08 | 3,836 | 481 | 4,317 | 11,487 |
| 11-Mar-08 | 2,558 | 416 | 2,974 | 11,606 |

Source: Bloomberg LLP

Platinum Contract Expiring April 2008
Electronic Trading, Pit Trading and Open Interest
From Inception to Conclusion

| Date | Electronic Trading | Pit Trading | Total Trading | Open Interest |
|---|---|---|---|---|
| 12-Mar-08 | 1,854 | 102 | 1,956 | 11,355 |
| 13-Mar-08 | 2,228 | 1,361 | 3,589 | 10,577 |
| 14-Mar-08 | 1,510 | 77 | 1,587 | 10,128 |
| 17-Mar-08 | 4,098 | 505 | 4,603 | 10,410 |
| 18-Mar-08 | 2,152 | 427 | 2,579 | 9,859 |
| 19-Mar-08 | 4,082 | 1,026 | 5,108 | 8,262 |
| 20-Mar-08 | 4,029 | 339 | 4,368 | 7,382 |
| 24-Mar-08 | 1,160 | 601 | 1,761 | 6,451 |
| 25-Mar-08 | 2,996 | 662 | 3,658 | 4,968 |
| 26-Mar-08 | 2,863 | 600 | 3,463 | 3,309 |
| 27-Mar-08 | 2,051 | 473 | 2,524 | 1,959 |
| 28-Mar-08 | 975 | 253 | 1,228 | 892 |
| 31-Mar-08 | 95 | 67 | 162 | 615 |
| 1-Apr-08 | 87 | | 87 | 585 |
| 2-Apr-08 | 79 | | 79 | 503 |
| 3-Apr-08 | 19 | 312 | 331 | 325 |
| 4-Apr-08 | 32 | | 32 | 150 |
| 7-Apr-08 | 32 | | 32 | 136 |
| 8-Apr-08 | 39 | | 39 | 94 |
| 9-Apr-08 | 19 | | 19 | 76 |
| 10-Apr-08 | 11 | 11 | 22 | 67 |
| 11-Apr-08 | 12 | | 12 | 54 |
| 14-Apr-08 | 10 | 10 | 20 | 15 |
| 15-Apr-08 | 14 | | 14 | 8 |
| 16-Apr-08 | 10 | | 10 | 14 |
| 17-Apr-08 | | | 0 | 14 |
| 18-Apr-08 | | | 0 | 14 |
| 21-Apr-08 | | | 0 | 14 |
| 22-Apr-08 | | | 0 | 14 |
| 23-Apr-08 | 1 | | 1 | 11 |
| 24-Apr-08 | 6 | | 6 | 5 |
| 25-Apr-08 | | | 0 | 5 |
| Total | 169,948 | 47,389 | 217,337 | |

Source: Bloomberg LLP